IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,250

STATE OF KANSAS,
*Appellant*,

v.

JESSENIA JIMENEZ,
*Appellee.*

SYLLABUS BY THE COURT

1.

A routine traffic stop is a seizure under the Fourth Amendment to the United States Constitution. Usually this encounter begins when the vehicle is pulled over and ends when the law enforcement officer has no further need to control the scene and tells the occupants they are free to leave.

2.

Traffic stops cannot be measurably extended beyond the time necessary to process the infraction that prompted the stop unless there is a reasonable suspicion of or probable cause to believe there is other criminal activity, or consent.

3.

Beyond simply determining whether to issue a citation, a law enforcement officer's mission in a traffic stop typically includes ordinary inquiries for: (i) checking the driver's license; (ii) determining whether there are outstanding warrants against the driver; and (iii) inspecting the automobile's registration and proof of insurance. The officer may also take negligibly burdensome precautions for officer safety. Information gathering must be

1

limited to the infraction prompting the stop or those matters directly related to traffic code enforcement, i.e., ensuring vehicles on the road are operated safely and responsibly.

4.

While a driver is being detained for a routine traffic stop, a law enforcement officer may not conduct questioning unrelated to the officer's mission if it measurably extends the stop—absent probable cause or the reasonable suspicion ordinarily demanded to justify detaining an individual.

5.

A law enforcement officer need not disregard information that may lead the officer to suspect other criminal activity during a traffic stop. When the detainee's responses and circumstances lead to suspicions unrelated to the traffic offense, an officer may broaden the inquiry and satisfy those suspicions.

6.

Travel plan questioning is not always within a traffic stop's scope. The circumstances will dictate that. To fall within the stop's scope, such questions must have a close connection to the initial infraction under investigation or to roadway safety, i.e., ensuring vehicles on the road are operated safely and responsibly. Otherwise, they may be pursued by law enforcement only at the same time as the officer is completing the tasks appropriate for processing the initial infraction. Questioning outside the stop's scope may not measurably extend the stop's duration absent reasonable suspicion or probable cause to independently support the added detention.

Review of the judgment of the Court of Appeals in an unpublished opinion filed February 24, 2017. Appeal from Geary District Court; MARITZA SEGARRA, judge. Opinion filed June 22, 2018. Judgment of the Court of Appeals reversing the district court is reversed. Judgment of the district court is affirmed and the case remanded.

*Tony R. Cruz*, assistant county attorney, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellant.

*Kasper Schirer*, assistant public defender, of Junction City, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: When a police officer stops a vehicle for a traffic infraction, a seizure occurs under the Fourth Amendment to the United States Constitution while the officer addresses the reason for the stop. *Whren v. United States*, 517 U.S. 806, 809-10, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996); *City of Atwood v. Pianalto*, 301 Kan. 1008, 1011, 350 P.3d 1048 (2015). Usually such encounters begin when the vehicle is pulled over and end when the officer has no further need to control the scene and tells the occupants they are free to leave. *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009). The time in-between is temptingly seen as a bountiful opportunity for unrelated criminal investigation, especially drug enforcement. The complication is the Fourth Amendment.

Traffic stops must not be measurably extended beyond what is necessary to process the infraction prompting the stop, unless there is reasonable suspicion of or probable cause to believe there is other criminal activity, or consent. *Rodriguez v. United States*, 575 U.S. __, 135 S. Ct. 1609, 1615, 191 L. Ed. 2d 492 (2015). To better define nonconsensual police-citizen encounters, the *Rodriguez* Court explained that beyond simply determining whether to issue a traffic ticket, an officer's "mission" typically includes ordinary inquiries for: (1) checking the driver's license; (2) determining whether there are outstanding warrants against the driver; and (3) inspecting the automobile's registration and proof of insurance. The officer may also take "negligibly burdensome

3

precautions" to complete the stop safely. But on-scene investigation into other crimes diverts from that mission and cannot become a permissible *de minimis* intrusion. 135 S. Ct. at 1615-16 ("Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular.").

In the current case, we consider the State's argument that "travel plan" questioning never unconstitutionally extends a traffic stop. The State contends this is always part of the officer's mission. But it is not that simple. Circumstances matter.

To qualify as a task necessary to process the initial stop, information gathering must be limited to the infraction prompting the stop or those other matters directly related to traffic code enforcement, i.e., "ensuring that vehicles on the road are operated safely and responsibly." 135 S. Ct. at 1615. Stated differently, some inquiries other than those listed as typical in *Rodriguez* may be necessary to ascertain whether vehicles are being operated safely and responsibly. But this necessity cannot translate into a bright-line rule permitting unbridled "travel plan" questioning that unconstitutionally extends these side-of-the-road detentions.

Under the facts presented, we hold the officer's detailed questions into travel plans, which delayed processing the driver's license and outstanding warrants inquiries, measurably extended the stop's duration and were not justified by any reasonable suspicion of or probable cause to believe there was other criminal activity. The district court correctly suppressed the evidence resulting from this unconstitutional detention.

We reverse the Court of Appeals, which came to the opposite conclusion by adopting a broader approach to travel plan questioning. See *State v. Jimenez*, No. 116,250, 2017 WL 758139 (Kan. App. 2017) (unpublished opinion). We remand the case to the district court for further proceedings.

4

FACTUAL AND PROCEDURAL BACKGROUND

The facts are undisputed. On January 11, 2016, Junction City Police Officer Nicholas Blake was on duty with his certified dog. He performed a traffic stop on a vehicle driven by Jessenia Jimenez after seeing her follow another vehicle too closely. Her black Ford Mustang had one passenger, Pablo Payeras. The officer had trouble communicating because they spoke little English, so he used hand gestures. They provided their driver's licenses and the automobile's rental agreement, which was in the glove box. Blake noticed the glove box contained money bundled in a rubber band. The rental documents showed the vehicle was picked up on January 9 in Las Vegas and due back January 14 at the same location. The officer asked Jimenez to accompany him to his patrol vehicle and said he likely would only issue a warning citation. She complied.

Once inside the police car, Blake used a smartphone application to question Jimenez because of the language barrier. He spoke into the phone, which translated what he said and vice versa. Blake asked where she was coming from, where she was heading, the trip's purpose, where she had slept recently, and with whom she had visited and for how long. She first answered she was coming from Utah and then changed to Colorado. She said her purpose was to visit her aunt. She said she spent one night with her aunt and slept on the road and stayed in a motel. Much of this back and forth had to be repeated due to background noise and imperfections in the translation technology.

About five minutes and 34 seconds passed between the vehicle stop and Blake calling the driver's license information into his dispatch. He also requested warrant checks and criminal history reports for Jimenez and Payeras. Shortly thereafter, Blake deployed his police dog to perform a sniff around the car. The dog alerted six minutes and 49 seconds after the stop began. Blake returned to Jimenez and asked whether there

5

were drugs in the car; she responded no. He asked if she had any large amounts of currency; she answered $8,000 from her aunt to pay rent.

Blake and two other officers searched the automobile. They discovered no drugs, but found three currency bundles: the one in the glove box, another in Payeras' wallet, and the third where the convertible roof retracts into the trunk. The cash totaled about $50,000. The State charged Jimenez with criminal transportation of drug proceeds and, in the alternative, criminal transfer of drug proceeds. See K.S.A. 2014 Supp. 21-5716(b), (c).

*The district court suppression order*

Before trial, Jimenez moved to suppress the traffic stop evidence, advancing three arguments: (1) there was no reasonable suspicion to pull the vehicle over; (2) Blake measurably extended the stop by asking travel plan questions before processing the driver's license and warrant information; and (3) any statements she gave violated *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1996), and any statements made after the *Miranda* warnings were tainted by the previous illegal questioning.

At the motion hearing, the evidence showed that once Blake and Jimenez entered the patrol vehicle, he asked: (1) where Jimenez and Payeras were coming from; (2) which direction they were coming from; (3) where they were coming from "right now"; (4) "Where are you coming from?" again; (5) "You are coming from Colorado right now?"; (6) "Colorado is that way?"; (7) what the trip's purpose was; (8) how long the pair was in Colorado; (9) "Where did you sleep at?"; (10) whether the pair slept on the road; and (11) whether they stayed with Jimenez' aunt or at a hotel. It was not until this questioning concluded that Blake transmitted the driver's license information for the

6

warrant and criminal history checks. Blake agreed that "none of these questions had anything to do [with] whether Ms. Jimenez was following too closely or not"; rather, he admitted "they were travel plans." He conceded her answers were not needed for him to write a ticket.

The State argued questions related to travel were always permissible and could not be counted in determining whether a traffic stop was lengthened. Jimenez contended four-and-a-half minutes of travel plan questioning impermissibly prolonged the stop by delaying running the occupants' information into dispatch. The court granted the motion to suppress.

The court ruled reasonable suspicion existed for the initial stop. That decision is not before us. Next, the court agreed with Jimenez that Blake measurably extended the stop with travel plan questioning unrelated to the traffic violation. It also found no articulable facts supported a reasonable suspicion that other criminal activity was occurring to justify the delay. The court deferred ruling on the *Miranda* issues because all evidence stemming from the searches was fruit of the poisonous tree. See *Wong Sun v. United States*, 371 U.S. 471, 484-87, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *State v. Epperson*, 237 Kan. 707, 718-19, 703 P.2d 761 (1985). The district court's order from the bench stated:

> "[T]he officer measurably extended the duration of the traffic stop to inquire into matters absolutely unrelated to the traffic infraction. Unrelated. And that were not based on reasonable suspicion that additional or other criminal activity had been . . . committed or were being committed; thus, converting the detention into an illegal seizure.
>
> "The officer spent five minutes questioning the defendant about unrelated matters before he ran her license information through dispatch. It is clear that he was not able to articulate any . . . facts to support any criminal activity before . . . he suspected as a basis

7

for asking the questions. He ran his dog around the car, and the dog did alert on the car, but that was after he had already extended the stop.

"He also asked for a criminal history on the defendant and the passenger which, again, had nothing to do with the initial stop, nor did he give any reason why he needed to do the same. . . .

"The officer could not state any facts that would support his belief or reasonable suspicion that there was criminal activity going on beyond the traffic infraction that would allow him to extend the duration of the stop in any way. It appears from the evidence that he was attempting to gain facts with his questioning to be able to search the car, and he was on a fishing expedition."

The State timely filed this interlocutory appeal. See K.S.A. 2017 Supp. 22-3603; see also *State v. Newman*, 235 Kan. 29, 34, 680 P.2d 257 (1984) (noting suppression must substantially impair the State's case to pursue interlocutory appeal).

*The Court of Appeals decision*

A Court of Appeals panel reversed. It acknowledged the Fourth Amendment prohibits general criminal investigations unrelated to the initial traffic stop if they measurably extend it. But the panel held no constitutional violation occurred because travel plan questions were always within a stop's scope. *Jimenez*, 2017 WL 758139, at *3. Relying on *State v. Morlock*, 289 Kan. 980, 218 P.3d 801 (2009), which we will discuss later, the panel held:

"[T]he minimal questioning about Jimenez' travel plans are the types of questions which are permitted to be asked. The questions concerned where Jimenez was coming from, where she was going, and where she was staying during her trip. *These types of questions are recognized in Kansas as being within the purpose of a traffic stop*." (Emphasis added.) *Jimenez*, 2017 WL 758139, at *4.

8

The panel then addressed sua sponte whether Blake unlawfully extended the stop by requesting criminal records. It did so even though it was not a determinative factor for the district court's ruling. The panel held the record check on Jimenez was within the stop's scope, so no Fourth Amendment violation occurred from that. It also noted the check on Payeras happened simultaneously with the check on Jimenez, so it did not measurably prolong the stop. *Jimenez*, 2017 WL 758139, at *4-5.

Jimenez petitioned this court to review the panel's decision, which we granted. Jurisdiction is proper. K.S.A. 20-3018(b) (petition for review of Court of Appeals' decision); K.S.A. 60-2101(b) (providing Supreme Court jurisdiction over cases subject to review under K.S.A. 20-3018).

ANALYSIS

Before addressing the officer's travel plan inquiries, it is best to describe: (1) Fourth Amendment jurisprudence relating to traffic stops, particularly *Rodriguez* and its progeny, which are cases this court has not had an opportunity to more fully explore; and (2) travel plan questioning's place within this jurisprudence. Jimenez argues *Rodriguez* substantially impacts our caselaw as well as her case, while the State contends *Rodriguez* is not on point. We disagree with the State, as will be explained. But before doing so, it is important to emphasize what this case is not about.

The State fails to claim any other matter made this traffic stop reasonable. There is no contention some inconsistency with the vehicle's rental agreement justified additional questioning, nor does the State argue the bundled cash seen in the glove box provided reasonable suspicion to ask questions to investigate possible criminal activity. In fact, Blake testified, "At the very moment of viewing [the cash], it was a mere observation,"

9

and he "had no reason to believe that the money had any illegal source." And the State does not claim Jimenez' responses to the travel plan questions warranted follow up based on the required reasonable suspicion or probable cause. Finally, it does not assert Jimenez consented to an extended encounter with Blake. We are not suggesting any legitimacy to such claims under these facts, just pointing out they were not made.

Our focus is limited to whether the four-and-a-half minutes Blake questioned Jimenez about her travel plans rendered the stop's duration unreasonable. The issue concerns travel plan inquiries as a generic category under the Fourth Amendment and whether such questioning is "within the purpose of a traffic stop," as the panel held. *Jimenez*, 2017 WL 758139, at \*4. Or, as the State succinctly argues in its brief, "Questions pertaining to travel plans are routine questions permitted during a traffic stop."

*Standard of review*

Faced with a motion to suppress evidence, the State bears the burden of proving the search and seizure were lawful. K.S.A. 22-3216(2); see also *State v. Gray*, 306 Kan. 1287, 1302, 403 P.3d 1220 (2017). As to the trial court's suppression order,

> "'an appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard. The ultimate legal conclusion drawn from those facts is reviewed de novo. . . . Substantial evidence refers to evidence that a reasonable person could accept as being adequate to support a conclusion. . . . This court does not reweigh the evidence, assess the credibility of the witnesses, or resolve evidentiary conflicts. [Citations omitted.]' *State v. Mattox*, 305 Kan. 1015, 1035, 390 P.3d 514 (2017)." *State v. Brown*, 306 Kan. 1145, 1151, 401 P.3d 611 (2017).

The facts are undisputed, so the appellate analysis focuses on the legal conclusions to be drawn from those facts.

*Traffic stop jurisprudence*

A routine traffic stop is a seizure under the Fourth Amendment. *State v. DeMarco*, 263 Kan. 727, 733, 952 P.2d 1276 (1998). In *DeMarco*, we noted federal caselaw dictated that

> "'[t]he scope and duration of a seizure must be strictly tied to and justified by the circumstances which rendered its initiation proper. *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).' *An investigative detention must last no longer than is necessary to effectuate the purpose of the stop. Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)." (Emphasis added.) *DeMarco*, 263 Kan. at 733-34 (quoting *State v. Damm*, 246 Kan. 220, 224, 787 P.2d 1185 [1990]).

A traffic stop is more analogous to an investigative detention than a custodial arrest, so courts treat the traffic stop, whether based on reasonable suspicion or probable cause, under the longstanding limitations from *Terry* for nonconsensual police-citizen contacts. *Rodriguez*, 135 S. Ct. at 1614. Under *Terry*, in addition to being justified at its inception, a lawful stop must be reasonably related in scope to the circumstances justifying the interference in the first place. *Terry*, 392 U.S. at 20. In the traffic stop context, the Court has said, "A seizure that is justified solely by the interest in issuing a warning ticket to the driver *can become unlawful if it is prolonged beyond the time reasonably required to complete that mission*." (Emphasis added.) *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005); cf. Annot., 118 A.L.R. Fed. 567 (noting during a traffic stop, a law enforcement officer often questions a motorist about matters unrelated to the traffic violation).

11

More recently, the Court built on *Caballes* by highlighting temporal boundaries for traffic stops that are not based on a rule of thumb about the minutes required for a routine stop, but on the circumstances tied to the officer's "mission" when conducting the stop. In *Rodriguez*, the Court described it this way: "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Rodriguez*, 135 S. Ct. at 1614. It explained: "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." 135 S. Ct. at 1614. In fleshing this out, the Court said:

> "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' [Citation omitted.] *Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance*." (Emphasis added.) 135 S. Ct. at 1615.

This means that during a stop an officer may not conduct nonconsensual inquiries unrelated to the mission in a way that prolongs the stop—without the reasonable suspicion ordinarily demanded to justify detaining an individual. Put yet another way,

> "A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. . . . *An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop*." (Emphasis added.) *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009).

See also *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) ("In assessing whether a detention is too long in duration to be justified as an

investigative stop, . . . it [is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."). And more particularly, police may not "extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." *Rodriguez*, 135 S. Ct. at 1614, 1616.

But these limitations do not mean police perform their duties with a blind eye. This court has stated,

> "An officer is not required to disregard information which may lead him or her to suspect independent criminal activity during a traffic stop. *When 'the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions*.'" (Emphasis added.) *Morlock*, 289 Kan. at 996.

Reasonable suspicion is "'a particularized and objective basis' for suspecting the person stopped" is engaged in criminal activity. *DeMarco*, 263 Kan. at 735. "Something more than an unparticularized suspicion or hunch must be articulated." 263 Kan. at 735. "Reasonable suspicion is a lower standard than probable cause, and '[w]hat is reasonable depends on the totality of the circumstances in the view of a trained law enforcement officer.'" *State v. Sharp*, 305 Kan. 1076, 1081, 390 P.3d 542 (2017). A court "must judge the officer's conduct in light of common sense and ordinary human experience under the totality of the circumstances." 305 Kan. at 1081. Moreover, the "determination is made with deference to a trained officer's 'ability to distinguish between innocent and suspicious circumstances,' while recognizing that it represents a 'minimum level of objective justification' and is 'considerably less than proof of wrongdoing by a preponderance of the evidence.'" 305 Kan. at 1081.

As with any *Terry* stop scenario, there is obvious tension between the constitutional imperative to diligently process a traffic infraction and the law enforcement opportunity to perform general criminal investigation. *Rodriguez* recognizes this by outlining the permissible scope and duration of police-citizen contact within the traffic stop context. The Court expressly confines the stop's mission to the typical traffic-related inquiries: (1) checking the driver's license; (2) determining whether there are outstanding warrants against the driver; and (3) inspecting the automobile's registration and proof of insurance. 135 S. Ct. at 1615. And it warns, "[o]n-scene investigation into other crimes . . . detours from that mission." 135 S. Ct. at 1616.

As LaFave comments, the "full significance" of *Rodriguez* is "best appreciated by taking into account various alternative approaches rejected by the . . . majority." 4 LaFave, Search & Seizure § 9.3(b) (5th ed. 2017). Those are (1) the *Rodriguez* dissenters' argument that *Terry*'s temporal limitations did not apply because the stop in that case was based on probable cause sufficient to support a custodial arrest; (2) arguments that dog sniffs within a short time after a traffic stop's completion are constitutionally permissible if they are *de minimis* intrusions; and (3) a rule-of-thumb approach under which the time taken during the stop is compared to what would be "'ordinary'" for a similar traffic stop and analyzed on that basis. 4 Search & Seizure § 9.3(b).

Still, as one *Rodriguez* dissenter noted, the majority's mission parameters are vulnerable to manipulation depending on how the officer sequences the permitted mission-related tasks. 135 S. Ct. at 1624 (Alito, J., dissenting). This observation prompted the majority, in essence, to confirm that the critical question was not whether the dog sniff in that case occurred before or after the officer issued a ticket, but whether conducting the sniff "'prolongs'—*i.e.*, *adds time to*—'the stop.'" (Emphasis added.) 135 S. Ct. at 1616.

14

This suggests officers engaging in traffic stops in *Rodriguez*' wake must be attentive to how and when they conduct what may be viewed as unrelated inquiries. They must be especially careful to ensure nonconsensual inquiries occur concurrently with the tasks permitted for such stops so they will not measurably extend the time it would otherwise take. We would more simply describe this today as multitasking. If not, the unrelated inquiries must be supported by reasonable suspicion, probable cause, or consent. Without this, the detention becomes unconstitutional.

This leads us to consider the questioning posed to Jimenez that prompted the district court to suppress the evidence. More particularly, we discuss the State's argument that unrestrained travel plan questioning is routine and always within a traffic stop's mission. As explained, we do not accept that broad perspective.

*Travel plan questioning*

The State claims the district court's reliance on *Rodriguez* was misplaced. The State asserts *Rodriguez* is limited to "whether officers had to have a reasonable and articulable suspicion to detain a vehicle *after* the conclusion of a traffic stop, in order to call for a drug canine." The State heavily relies instead on this court's *Morlock* decision, as well as other pre-*Rodriguez* federal circuit court cases. The State's contentions are critically flawed.

Starting with *Rodriguez*, as explained, a plain reading shows the Court's intention to clarify that any traffic stop extension without reasonable suspicion or consent—by even a *de minimis* length of time—amounts to an unreasonable seizure when the delay is based on anything but the articulated components of the stop's mission. *Rodriguez*, 135 S. Ct. at 1615. Noticeably, travel plan questioning is not on the Court's enumerated short list

15

of things to do—even though travel inquiries were made during the stop under study in *Rodriguez*. 135 S. Ct. at 1613 (the officer "began to question [the passenger] about where the two men were coming from and where they were going").

The State, of course, is correct that the precise dispute in *Rodriguez* was "whether the Fourth Amendment tolerates a dog sniff conducted after completion of a traffic stop." 135 S. Ct. at 1612. But the decision's language unquestionably reaches beyond that specific circumstance. See 135 S. Ct. at 1616 ("The critical question . . . is not whether [an unrelated investigation] occurs before or after the officer issues a ticket, . . . but whether [it] adds time . . . to 'the stop.'"). And its principles have been applied in search and seizure and investigative detention cases after a stop's completion unrelated to dog sniffs. See, e.g., *Utah v. Strieff*, 579 U.S. __, 136 S. Ct. 2056, 2063, 195 L. Ed. 2d 400 (2016) (cited to support officer's decision to run warrant check); *United States v. Cone*, 868 F.3d 1150, 1151 (2017) (cited to support proposition that proper scope of traffic stop includes "certain negligibly burdensome precautions" taken for officer safety). One simply cannot read *Rodriguez* and its progeny without concluding that it lays down general principles applicable to all traffic stops.

The *Rodriguez* court proclaimed a traffic stop's purpose is addressing the infraction and forbade the stop's duration be any longer than necessary to effectuate that purpose. *Rodriguez*, 135 S. Ct. at 1614 ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."). This leads us to conclude *Rodriguez* does not envision unbridled travel plan questioning as a staple of traffic stop inquiries. Circumstances will dictate whether and to what extent such questions become part of the mission.

As noted above, the State's logic depends on this court's *Morlock* decision, which the panel cited as well. The State touts *Morlock* as giving investigating officers free rein

to ask travel-related questions without regard to their scope or duration. But the State ignores the facts relied on by the *Morlock* court and consequently misinterprets it. In *Morlock*, two occupants were in a vehicle stopped for twice failing to signal while changing lanes. The officer separated the occupants and individually asked about their travel plans. One issue in this pre-*Rodriguez* appeal was whether the officer exceeded the stop's constitutionally permissible boundaries by asking both occupants travel questions. 289 Kan. at 989. In analyzing the facts, the *Morlock* court differentiated the officer's questioning based on the circumstances.

The *Morlock* court noted the officer asked the driver several travel plan questions; only two were in controversy before the court: how long he had been in Phoenix and why he was there. In approving these two questions, the *Morlock* court emphasized the officer's authority to engage in "*limited questioning*." 289 Kan. at 992. And the facts show these two questions were interspersed with the officer's inquiries about the driver's license and the vehicle registration.

The three other questions in controversy were asked of the passenger, who rented the vehicle. While the passenger was locating the rental agreement, the officer asked him: (1) where he was going or coming from, (2) why he had gone to Phoenix, and (3) why after flying there he was driving back in a rented van. The court held these questions could not have measurably extended the stop because they were concurrent with inspecting the rental documents. The court then determined any remaining questions were justified by a reasonable suspicion of other criminal activity. 289 Kan. at 994-95.

To be fair, some language in *Morlock* is susceptible to a larger view, but the State overgeneralizes to claim it broadly authorizes an officer "to inquire about travel plans during a routine traffic stop, without unconstitutionally extending the length of the traffic

17

stop." More careful attention to the *Morlock* analysis shows it tracks the reasoning now requiring a more limited scope. See *Rodriguez*, 135 S. Ct. at 1615.

Similarly, the State suggests three post-*Rodriguez* decisions from the Tenth Circuit support its broader proposition that travel plan questions should not be counted when deciding whether a traffic stop is measurably extended. The first, *United States v. Cone*, 868 F.3d 1150 (10th Cir. 2017), makes no such conclusion. Indeed, it did not even reach the travel plan questioning challenge. But when referring to it, the *Cone* panel commented in passing, "Defendant's contention is hardly frivolous." 868 F.3d at 1154. In the second, *United States v. Moore*, 795 F.3d 1224 (10th Cir. 2015), the facts show the travel plan questioning occurred while the trooper wrote the ticket and examined the vehicle registration. And even though the case turned on issues of consent and reasonable suspicion, the *Moore* court acknowledged the *Rodriguez* guiding directive: "An officer may also generally inquire about the driver's travel plans [citation omitted] and ask questions, whether or not related to the purpose of the stop, *so long as they do not prolong the stop*." (Emphasis added.) 795 F.3d at 1229. The third, *United States v. Pettit*, 785 F.3d 1374 (10th Cir. 2015), did not carefully analyze the travel plan questioning because the issue was whether the trooper had reasonable suspicion to extend the stop by questioning the driver after he finished processing the traffic infraction. 785 F.3d at 1380. The *Pettit* court mentioned an officer may ask about a driver's travel plans as well as "matters unrelated to the stop" but explicitly noted such inquiries' limitation by citing *Rodriguez*: "A lawful traffic stop may not extend *beyond the time reasonably required to effectuate its purpose*." (Emphasis added.) 785 F.3d at 1379.

To be clear, we are not suggesting *Rodriguez* and its progeny instruct that all travel plan questioning will be outside an officer's traffic stop mission. The circumstances will determine that. Such inquiries could be within a particular stop's mission if it were shown they "serve the same objective as enforcement of the traffic code: ensuring that

18

vehicles on the road are operated safely and responsibly." *Rodriguez*, 135 S. Ct. at 1615. For example, and without prejudging specific scenarios, consider when a vehicle is noticed veering off the roadside. Asking how long the driver has been behind the wheel reasonably could be seen as exploring fatigue issues, which relates to the initial infraction and safe vehicle operation. Similarly, asking whether the driver is under the influence could be related to that same infraction. In both instances, the responses may explain the erratic driving and might arguably be related to the officer's decision "whether to issue a traffic ticket . . . ." 135 S. Ct. at 1615. But such inquiry would be much harder to justify when the stop is "for a loud muffler, a burned-out license plate light, or a just-ended parking violation." 4 Search & Seizure § 9.3(d).

These scenarios highlight why circumstances dictate how a court views travel plan questioning. And courts must guard against what might be called "mission creep" by rejecting poorly justified excuses for law enforcement actions that temporally extend traffic stop encounters but lack "the same close connection to roadway safety" as those tasks enumerated in *Rodriguez*. 135 S. Ct. at 1611. In other words, when travel plan questions can be seen as having a close connection to roadway safety, they can occur without unconstitutionally extending the stop's scope. See 4 Search & Seizure § 9.3(d) (rejecting argument that travel plan questions are always within the traffic stop's scope and noting *Rodriguez*' listing did not include such questioning as part of the mission); *State v. Schooler*, (No. 116,636, this day decided), slip op. at 19 (holding travel questions were unrelated to traffic infraction for snow-obscured license tag but occurred concurrently with tasks necessary to process the traffic stop); *State v. Lowery*, (No. 116,637, this day decided), slip op. at 9 (noting officer's inquiry about how long driver had been operating vehicle appeared related to mission of addressing traffic infraction for driving too closely, and that other travel plan questions occurred concurrently with the tasks necessary to process the traffic stop).

19

That said, *Rodriguez* makes clear questioning into matters unrelated to the initial infraction—like those about travel plans—is permissible so long as it does not extend the stop's duration. 135 S. Ct. at 1615. As a practical matter, *Rodriguez* requires careful case-by-case evaluation to determine how the officer conducted or ordered the activities associated with the traffic stop. What is certain is that the State's effort to have Kansas courts condone across-the-board travel plan inquiries cannot be justified under *Rodriguez* as routine incidents of traffic stops.

We examine next how this particular traffic stop occurred and whether the officer impermissibly extended its length. We conclude he did.

Rodriguez' *application*

Blake asked Jimenez when both were in the patrol car the questions described above. At the hearing, Blake admitted his questions concerned "merely travel plans" that had nothing to do with the traffic violation he observed, and he acknowledged her answers were unnecessary for him to write a ticket. Above all, it is obvious Blake conducted his questioning before he called in the driver's licenses and outstanding warrants checks. Under these undisputed facts, we agree with the district court the questioning was unrelated to the infraction or the traffic stop's mission and measurably extended the stop.

When "a traffic stop is extended in time beyond the period that the officers are completing tasks related to the traffic infractions, the officers must either obtain consent from the individuals detained or identify reasonable suspicion of criminal activity to support the extension of the stop." *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017). The *Hill* court noted:

20

"The 'acceptable length of a routine traffic stop,' however, 'cannot be stated with mathematical precision.' [Citation omitted.] In evaluating the reasonableness of a stop, we consider 'what the police in fact do,' and whether the officers acted reasonably under the totality of the circumstances presented to them. [Citations omitted.] Thus, an officer need not employ 'the least intrusive means conceivable' in executing a stop, but he still must be *reasonably diligent* and must use 'the least intrusive means reasonably available.' [Citations omitted.]

"An officer may engage in certain safety measures during a traffic stop, but generally *must focus his attention on the initial basis for the stop*. [Citation omitted.] An officer may engage in 'ordinary inquiries incident to' the traffic stop, such as inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants. [Citation omitted.]" (Emphases added.) 852 F.3d at 381-82.

Instead of pursuing his mission—inspecting the driver's license, verifying the registration and insurance, and determining if Jimenez was subject to outstanding warrants—Blake chose a different, unrelated investigation into Jimenez' recent activities, but "not to gain some insight into the traffic infraction providing the legal basis for the stop." 4 Search and Seizure § 9.3(d). This prolonged the stop because Blake was doing nothing in the interim to process the traffic violation. And he repeatedly testified he did not suspect criminal activity, so there was no colorable, independent justification for the portions of the detention attributable solely to the unrelated inquiries. As a result, this extended detention violated the Fourth Amendment. The district court correctly ordered suppression.

Finally, we address what appears as an aside in the panel's decision that notes: "[T]he entire stop from beginning until the dog alerted, was 6 minutes and 49 seconds. *This was not an unreasonable amount of time*." (Emphasis added.) *Jimenez*, 2017 WL 758139, at *3. We highlight this out of concern the panel was alluding to a standard

21

expressly rejected by *Rodriguez*, i.e., a rule-of-thumb approach, under which the time taken during the stop is compared to what would be "ordinary" for a similar encounter. See *Rodriguez*, 135 S. Ct. at 1616 (rejecting the Government's argument "the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances"; holding the stop's reasonableness "depends on what the police in fact do").

Granted, *Rodriguez* contains the statement, "Authority for the seizure thus ends when tasks tied to the traffic infraction are—*or reasonably should have been*—completed." (Emphasis added.) 135 S. Ct. at 1614. But the decision makes clear this phrasing was not signaling a stop's reasonable duration is to be judged by a hypothetical "ordinary" stop. See 4 Search & Seizure § 9.3(b).

We reverse the panel's holdings and affirm the district court's decision to suppress the evidence at issue. We remand the case to the district court for further proceedings.