NOT DESIGNATED FOR PUBLICATION

No. 116,492

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ABIGAIL KRISTINE BROWN,
*Appellant*.


MEMORANDUM OPINION

Appeal from Saline District Court; PATRICK H. THOMPSON, judge. Opinion on remand filed January 11, 2019. Affirmed.

*Heather Cessna*, of Kansas Appellate Defender Office, for appellant.

*Amy E. Norton*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., MALONE, J., and MERLIN G. WHEELER, District Judge, assigned.

PER CURIAM: Abigail Brown (Abigail) appeals her convictions of three counts of possession of a controlled substance and one count of possession of drug paraphernalia. Abigail claims the district court erred when it denied her motion to suppress the evidence. Our court initially affirmed the district court's judgment in an opinion filed December 15, 2017. *State v. Brown*, No. 116,492, 2017 WL 6395901 (Kan. App. 2017) (unpublished opinion). Abigail filed a petition for review. On November 30, 2018, the Kansas Supreme Court filed an order that summarily vacated our court's original decision and remanded for reconsideration in light of *State v. Jimenez*, 308 Kan. 315, 420 P.3d 464 (2018); *State v. Schooler*, 308 Kan. 333, 419 P.3d 1164 (2018); and *State v. Lowery*, 308 Kan. 359, 420

1

P.3d 456 (2018). After considering these recent decisions and applying them to our facts, we again uphold the district court's decision to deny the motion to suppress.

We begin by reciting the facts in our original opinion:

"On November 20, 2015, Norris, a deputy for the Saline County Sheriff's Office, was on duty by himself with his drug K-9 on Interstate 70, where the posted speed limit was 75 miles per hour. Soon after midnight, Norris clocked a car traveling 87 miles per hour, and he proceeded to pull the car over. Alexandra Brown (Alexandra) was driving the car, and her sister, Abigail, was a passenger.

"While approaching the car from the passenger side, Norris observed that the car had multiple air fresheners hanging from the rearview mirror. He also observed that the car had a 'lived-in' appearance, meaning that the car contained lots of trash in the form of empty drinks and empty bags of food. Norris asked the women where they were going, and they indicated they had been driving for about 15 hours from Ohio where they had traveled to see their father. Norris discovered that the car was a rental car, and the Browns provided Norris with the rental agreement. Alexandra told Norris that her grandmother had rented the car for them because they did not have credit cards. While reviewing the rental agreement, Norris noticed that the rental car was past due.

"Norris asked the Browns for their driver's licenses, which they provided him. Norris took the driver's licenses and the rental agreement back to his vehicle for further investigation. When Norris got back to his vehicle, he requested that Deputy Jay Martin come to their location. Norris requested backup so that Martin could complete the speeding citation while Norris performed an exterior sniff search with his K-9.

"When Martin arrived, Norris had just begun typing the digiticket. After Norris briefly informed Martin of the situation, Martin began completing the citation in Norris' vehicle. Norris asked the Browns to exit the car so his K-9 could perform the sniff search. Following some resistance from Alexandra, the Browns exited their vehicle. Norris and his K-9 then conducted the exterior sniff search of the rental car, and the K-9 alerted in front of the passenger side door.

"Based on the K-9's alert, Norris searched the car. In two bags inside the car, Norris found marijuana, a glass pipe, a metal pipe, and prescription medication: dextroamphetamine and oxycodone, which were not prescribed to Alexandra or Abigail.

Norris' body camera recorded his entire encounter with the Browns. Martin's body camera also recorded his involvement with the traffic stop. For simplicity, we will summarize the timeline of events in accordance with Norris' and Martin's body cameras:

- At 12:09, Norris approached the Browns' rental car.
- At 12:11, Norris obtained the Browns' driver's licenses and rental agreement.
- At 12:12, Norris returned to his vehicle and began reviewing the rental agreement.
- At 12:13, Norris radioed Martin for backup.
- At 12:14, Norris radioed dispatch to run a status and warrants check on Alexandra.
- At 12:15, Norris completed his relay of Alexandra's information to dispatch.
- At 12:17, dispatch radioed its findings on Alexandra to Norris.
- Between 12:15 and 12:17, while corresponding with dispatch, Norris reviewed the rental agreement and the driver's licenses.
- At 12:18, Norris radioed dispatch to run a status and warrants check on Abigail.
- At 12:19, dispatch radioed its findings on Abigail to Norris; she had no outstanding warrants.
- At 12:20, Martin arrived on the scene and Norris can be heard typing out the citation.
- From 12:20 to 12:21, Norris informed Martin of the situation and instructed him to complete the citation.
- At 12:21, Norris instructed the Browns to exit the car so he could perform an exterior sniff search.
- At 12:22, Norris got his dog out of his vehicle.
- At 12:23, the dog alerted at the passenger side door, indicating that contraband was in the car.
- At 12:24, the dog sniff was complete.

"Based on these events, the State charged Abigail with three counts of unlawful possession of a controlled substance and one count of possession of drug use paraphernalia. Abigail subsequently filed a motion to suppress the evidence. In the motion, Abigail argued, among other things, that Norris unnecessarily prolonged the stop without reasonable suspicion of any crime other than the speeding violation.

"On February 11, 2016, the district court held a hearing on Abigail's motion to suppress. Both Norris and Martin testified at the hearing, and a DVD of the stop was admitted into evidence. In addition to the above facts, Norris testified that normally it takes approximately 15 minutes from the time of an initial traffic stop to the time required to complete a citation. That estimation was based on Norris writing between 250 to 300 citations and warnings a year and also on Norris having worked with his department's computerized citation format for three years.

"After hearing the evidence, the district court made detailed factual findings about the law enforcement investigation and the duration of the traffic stop. The district court found that the entire traffic stop, from the time the stop was initiated until the dog sniff search was completed, occurred within 15 minutes. From these findings, the district court concluded that Norris diligently pursued his investigation and did not purposely prolong the stop. The district court also concluded that Norris did not measurably extend the duration of the traffic stop in order to perform the K-9 sniff search. Accordingly, the district court denied the motion to suppress.

"On April 11, 2016, the case proceeded to a bench trial on stipulated facts. Based on the stipulated evidence, the district court found Abigail guilty on all counts. On June 27, 2016, the district court imposed a controlling sentence of 11 months' imprisonment and placed Abigail on probation for 12 months. Abigail timely appealed her convictions." 2017 WL 6395901, at *1-2.

In her original brief to our court, Abigail argued that Norris measurably extended the duration of her traffic stop longer than normally required for the issuance of a citation. She argued that Norris purposely delayed his execution of the citation while waiting for backup, so he could take his drug-sniffing K-9 around the car. This way, Abigail asserted, Norris made it appear as though the traffic stop was not extended beyond the issuance of her citation. In addition, Abigail contended that Norris did not gain a reasonable suspicion of criminal activity to extend the scope of the stop.

In its initial brief, the State argued that Norris did not delay the traffic stop beyond the normal time to issue a citation. The State contended that when considering the totality of the circumstances, Norris did not unreasonably extend the duration of the stop to

4

perform the K-9 sniff search. The State also argued that Norris had reasonable suspicion of criminal activity to extend the scope of the stop beyond the issuance of a citation.

An appellate court applies a bifurcated standard of review of a district court's decision on a motion to suppress. The appellate court reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016). The district court's ultimate legal conclusion is reviewed using a de novo standard. 304 Kan. at 274. When the material facts to the district court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court has unlimited review. *State v. Cleverly*, 305 Kan. 598, 604, 385 P.3d 512 (2016).

In our initial decision, we agreed with the district court that Norris did not measurably extend the duration of the traffic stop in order to perform the K-9 sniff search. 2017 WL 6395901, at *4. We also found from the evidence that Norris diligently pursued his investigation and did not purposely prolong the traffic stop so that he could conduct his search. 2017 WL 6395901, at *4-5. We concluded that because Norris conducted the K-9 sniff search and located the contraband without measurably extending the duration of the initial traffic stop, we did not need to address whether he had reasonable suspicion of additional criminal activity to extend the scope of the stop. 2017 WL 6395901, at *5. As ordered by our Supreme Court, we will reconsider our original decision in light of the later rulings in *Jimenez*, *Schooler*, and *Lowery*.

State v. Jimenez

In *Jimenez*, Officer Nicholas Blake performed a traffic stop on a vehicle driven by Jimenez. After obtaining driver's licenses from Jimenez and her passenger, Blake asked Jimenez to go with him to his patrol vehicle, saying "he likely would only issue a warning citation." 308 Kan. at 318. Once they were inside the patrol vehicle, Blake

5

questioned Jimenez for four and one-half minutes about her travel plans. After these questions, and about five and one-half minutes into the traffic stop, Blake called the driver's license information into dispatch. He then deployed his police dog to perform a search around the car. Six minutes and 49 seconds into the traffic stop, the dog alerted. A search of the automobile revealed about $50,000 in cash, and "[t]he State charged Jimenez with criminal transportation of drug proceeds and, in the alternative, criminal transfer of drug proceeds." 308 Kan. at 318-19.

In the district court, Jimenez moved to suppress the traffic stop evidence. The district court granted the motion, finding that the initial stop was supported by reasonable suspicion, but that "Blake measurably extended the stop with travel plan questioning unrelated to the traffic violation," and "no articulable facts supported a reasonable suspicion that other criminal activity was occurring to justify the delay." 308 Kan. at 319-20. The State appealed, and this court reversed the district court, holding that minimal travel plan questions are always within the scope of a traffic stop. 308 Kan. at 320.

Jimenez petitioned for review and the question before our Supreme Court was "limited to whether the four-and-a-half minutes Blake questioned Jimenez about her travel plans rendered the stop's duration unreasonable." 308 Kan. at 322. Our Supreme Court examined relevant traffic stop jurisprudence, noting that "during a stop an officer may not conduct non-consensual inquiries unrelated to the [traffic-stop] mission in a way that prolongs the stop—without the reasonable suspicion ordinarily demanded to justify detaining an individual." 308 Kan. at 323-24. The court also explained that officers

> "must be attentive to how and when they conduct what may be viewed as unrelated inquiries. They must be especially careful to ensure nonconsensual inquiries occur concurrently with the tasks permitted for such stops so they will not measurably extend the time it would otherwise take. . . . If not, the unrelated inquiries must be supported by reasonable suspicion, probable cause, or consent. Without this, the detention becomes unconstitutional." 308 Kan. at 326.

6

Applying this jurisprudence, our Supreme Court rejected the State's argument that all travel plan inquiries are per se routine incidents of traffic stops. 308 Kan. at 326-30. Instead, "questioning into matters unrelated to the initial infraction—like those about travel plans—is permissible so long as it does not extend the stop's duration." 308 Kan. at 330. Under the facts before it, our Supreme Court affirmed the district court, noting that Blake's travel plan questions impermissibly prolonged the traffic stop "because Blake was doing nothing in the interim to process the traffic violation," and he had no "colorable, independent justification for the portions of the detention attributable solely to the unrelated inquiries." 308 Kan. at 331.

Finally, our Supreme Court noted the following statement from this Court of Appeals' decision: "'[T]he entire stop from beginning until the dog alerted, was 6 minutes and 49 seconds. This was not an unreasonable amount of time.'" 308 Kan. at 331. In response to this finding, our Supreme Court stated:

> "We highlight this out of concern the panel was alluding to a standard expressly rejected by *Rodriguez* [*v. United States*, 575 U.S. ___, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015)], i.e., a rule-of-thumb approach, under which the time taken during the stop is compared to what would be 'ordinary' for a similar encounter.
>     "Granted, *Rodriguez* contains the statement, 'Authority for the seizure thus ends when tasks tied to the traffic infraction are—*or reasonably should have been*—completed.' (Emphasis added.) But the decision makes clear this phrasing was not signaling a stop's reasonable duration is to be judged by a hypothetical 'ordinary' stop. [Citations omitted.]" *Jimenez*, 308 Kan. at 332.

## State v. Schooler

*Schooler* also addressed whether a traffic stop was impermissibly extended. In that case, Sheriff's Deputy Justin Stopper initiated a traffic stop after noticing that the license plate on the pickup Shaun Schooler was driving was partially obstructed by snow. While Schooler was gathering his driver's license and rental agreement for the truck, Stopper

asked where Schooler was coming from. Schooler stated he had initially flown into Kansas City, rented the truck, driven to Denver to ski and to drop off a 16-foot trailer, and was heading back to Kansas City to fly home to California.

The vehicle rental agreement stated that it had been rented in California a few days earlier and was due back there a few days later. When Stopper expressed disbelief about Schooler's alleged travel plans, Schooler offered to produce airline tickets and began searching for them, but he never produced them. Stopper also noticed the truck contained a large duffel bag, several cell phones, and "debris" in the passenger compartment, and it smelled of air fresheners. Stopper suggested that he and Schooler return to the patrol car because it was cold; they did, and Stopper texted for a drug dog.

Once in the patrol car, Stopper reviewed Schooler's driver's license and rental documents and entered information into the vehicle's mobile data terminal, all while continuing to question Schooler's alleged travel plans and finding the answers suspicious. About six minutes into the stop, Stopper learned from his data terminal that Schooler was on federal supervised release, but Schooler was reluctant to explain why. About 7 minutes and 30 seconds into the stop, Stopper called in Schooler's driver's license information to dispatch. While waiting for a reply, Stopper continued questioning Schooler about "'pretrial status and stuff.'" 308 Kan. at 337. Schooler explained that he had gotten in trouble for having a "'very little'" bit of cocaine on a federal base. 308 Kan. at 338. Stopper questioned whether Schooler was being truthful and continued to ask about his travel plans and his supervised release.

At about 13 minutes into the stop, Stopper called in to dispatch with "variations in the vehicle license tag numbers, noting the snow was obscuring some letters and numbers and some might have been reported incorrectly earlier." 308 Kan. at 338. Dispatch responded with additional information about Schooler's criminal history, and Stopper asked additional questions about the crime underlying the federal supervision. At almost

8

15 minutes into the stop, Stopper conveyed additional license plate variations to dispatch. At 17 minutes into the stop, Stopper told Schooler he was going to give him a warning ticket and that Schooler was "good to go." 308 Kan. at 339.

Almost immediately, however, Stopper asked if he could ask Schooler "'a couple more questions,'" and when Schooler stated he wanted to "'get back on the road,'" Stopper asked if there were contraband, large amounts of money, or firearms in the truck. 308 Kan. at 339. Schooler said no, and he also denied a request to search the truck. Stopper stated that he was detaining Schooler because "'[y]our story's garbage. I believe criminal activity is afoot.'" 308 Kan. at 339. At this point, the stop had lasted 18 minutes and 30 seconds. Eleven minutes later, a drug dog arrived; it alerted, and a subsequent search revealed drugs and scales.

Schooler was charged with drug crimes and moved to suppress the evidence seized in the search of the truck. The district court granted the motion, finding that the traffic stop's original mission ended when Stopper said Schooler was "good to go" and in fact "'would have been completed for an additional several minutes prior to the drug dog arriving had . . . Stopper been diligent in his records check.'" 308 Kan. at 342. The district court found that Stopper had initially exceeded the scope of the traffic stop without reasonable suspicion of other crimes, Schooler's responses to questioning did not provide reasonable suspicion to detain him, Stopper informing Schooler that he was free to leave was a concession that there was no reasonable suspicion to continue to detain him, and Stopper had no reasonable suspicion to detain Schooler to wait for a drug dog. 308 Kan. at 342. On appeal by the State, this court affirmed the district court's judgment. 308 Kan. at 342-43.

On a petition for review, our Supreme Court reiterated the explanation by the United States Supreme Court that "an officer's 'mission' during [traffic] stops typically includes ordinary inquiries to (1) check the driver's license; (2) determine whether there

9

are outstanding warrants against the driver; and (3) inspect the vehicle's registration and proof of insurance." 308 Kan. at 345-46 (citing *Rodriguez*, 135 S. Ct. at 1615). The *Schooler* court noted its holding in *Jimenez* that an officer may not conduct nonconsensual inquiries during a traffic stop that are unrelated to the mission of the stop in a way that prolongs the stop unless the officer has reasonable suspicion to justify the detention of the individual. 308 Kan. at 346. That said, the *Schooler* court also noted that an officer need not "'disregard information which may lead him or her to suspect independent criminal activity during a traffic stop.'" 308 Kan. at 346-47.

Turning to the facts before it, the *Schooler* court noted that Stopper's initial travel-plan questions "did not impermissibly extend the stop because the questioning occurred concurrently with the tasks [Stopper] was performing to complete the stop and was justified by discrepancies between Schooler's story and the rental agreement." 308 Kan. at 347. The Supreme Court emphasized that both the district court and the Court of Appeals had not considered whether Stopper's questions "overlapped" his performance of the tasks necessary to complete the mission of the traffic stop. 308 Kan. at 349-50. Doing so, the Supreme Court held:

> "[U]p to the time [Stopper] advised Schooler of his detention, [Stopper] did not impermissibly extend the traffic stop's duration. The recordings show [Stopper] was continuously engaged with Schooler as [Stopper] processed the traffic stop while trying to satisfy his suspicions about the conflicts in what he was observing and being told." 308 Kan. at 350.

After holding there was no legal impact in Stopper telling Schooler that he was "good to go," the *Schooler* court turned to whether Stopper had reasonable suspicion at that point to detain Schooler to wait for the drug dog. 308 Kan. at 350-53. Based on the air freshener, several cell phones, discrepancies between Schooler's answers and the rental document, Schooler's evasive answers about his travel plans, and ambiguous answers to questions about his criminal history, the Supreme Court held that reasonable

suspicion of other criminal activity existed when Stopper told Schooler he was free to go, so Stopper's further detention of Schooler comported with the Fourth Amendment. 308 Kan. at 356. The Supreme Court therefore reversed the suppression of the evidence and remanded for further proceedings. 308 Kan. at 356.

State v. Lowery

In *Lowery,* Officer Nicholas Blake initiated a traffic stop on a vehicle driven by Derrick Lowery for following too closely. During the stop, Lowery accompanied Blake to his patrol car. While Blake filled out the citation and called dispatch with Lowery's license information, Lowery told Blake that he was going to Denver from Knoxville; he was driving a car belonging to a friend because it was cheaper than flying; and his passenger was going with him to "maybe get a job at a ski resort." 308 Kan. at 360. Blake returned to the vehicle and asked Lowery's passenger about their travel plans; the passenger stated they were only going to Colorado for a few days and then would return to Knoxville, where the passenger had a job. At about 12 minutes into the stop, Blake went back to his patrol car, received information from dispatch about Lowery, gave Lowery a citation, and then told him he was free to go.

As Lowery got out of the patrol car but before he shut the door, Blake asked if Lowery would answer more questions, and Lowery agreed. Lowery denied having anything illegal in his car, but he also refused Blake's request to search it. Blake asked if "Lowery would have a problem if a drug dog came," and Lowery asked if he had to wait or if he could leave. 308 Kan. at 361. At that point, Blake detained Lowery and, when he could not get a response to his request for a drug dog, Blake left the scene in the hands of a backup officer and went to his own home where he retrieved his drug dog. About 35 minutes after the stop began, Blake ran his drug dog around the car and discovered "drug-related evidence." 308 Kan. at 361.

11

The State charged Lowery with various drug crimes, and he moved to suppress the evidence found in the search. The district court granted the motion to suppress, finding that Blake had unlawfully detained Lowery without reasonable suspicion of criminal activity. 301 Kan. at 362. On appeal by the State, this court affirmed. 308 Kan. at 363.

On a petition for review, the only issue before our Supreme Court was whether there was reasonable suspicion to detain Lowery once the initial traffic stop ended. 308 Kan. at 366. Our Supreme Court reviewed the State's asserted basis for reasonable suspicion: "(1) nervousness; (2) inconsistent travel plan statements; (3) operating a third-party vehicle; (4) traveling to Colorado; (5) the vehicle's recent presence in Columbia, Missouri"—Blake had learned from a Missouri state trooper during the traffic stop that the vehicle had been in Columbia three times in the prior month—and (6) Blake's "online research of airline prices" during the traffic stop, which revealed that all but one airline offered tickets at prices cheaper than the cost of driving from Knoxville to Denver. 308 Kan. at 362, 367-70. Our Supreme Court held that the State had not met its burden to show that the detention was lawful because Blake had not provided "'an objectively reasonable and articulable suspicion that criminal activity was or is taking place'" when he refused to allow Lowery to leave the patrol car. 308 Kan. at 370.

Applying Jimenez, Schooler, and Lowery to Abigail's case

Returning to our facts, we conclude that *Jimenez*, *Schooler*, and *Lowery* do not change the outcome of Abigail's case, although these decisions cause us to modify our reasoning. In our original decision, we noted that Norris testified, based on his extensive experience with traffic stops, that "it takes approximately 15 minutes from the time of an initial stop to the time required to complete a citation" and that the evidence showed that the K-9 alerted for drugs on Abigail's car within 15 minutes of the stop. 2017 WL 6395901, at *4. But in *Jimenez*, our Supreme Court emphasized that courts should not determine whether traffic stops are impermissibly extended by comparing their duration

12

to that of a "hypothetical 'ordinary' stop." 308 Kan. at 332. So the fact that the drug dog alerted on Abigail's car within 15 minutes of the stop—which is the duration of an ordinary traffic stop—does not control whether Norris measurably extended the duration of the traffic stop.

That said, the evidence supports the district court's finding that Norris diligently pursued his investigation and did not purposely prolong the traffic stop so that he could conduct his search. Abigail's case does not involve extensive travel plan questioning that we have in *Jimenez*, *Schooler*, and *Lowery*. Norris simply asked the women where they were going, learned that the vehicle was a rental car, and immediately discovered that the rental agreement had expired. Norris asked Abigail and her sister for their driver's licenses, which they provided him. Norris took the driver's licenses and the rental agreement back to his vehicle for further investigation. When Norris got back to his vehicle, he requested that Deputy Martin come to their location as backup. While waiting for Martin, Norris reviewed the rental agreement and driver's licenses and radioed dispatch to run a warrants check on Abigail and her sister. Dispatch radioed its findings that there were no outstanding warrants.

When Martin arrived a few minutes later, Norris had just begun typing the digiticket. After Norris briefly informed Martin of the situation, Martin began completing the citation in Norris' vehicle. Norris asked Abigail and her sister to exit the car so his K-9 could perform the sniff search. Norris and his K-9 then conducted the exterior sniff search of the rental car, and the K-9 alerted in front of the passenger side door.

The district court found that Norris obtained the Browns' information in a reasonable amount of time. The district court found that Norris returned to his car and began diligently reviewing the information, calling the information into dispatch after his initial review. As soon as he heard back from dispatch, Norris immediately began typing the citation. The district court noted that it heard Norris typing the citation from his body

13

camera from the time he spoke to dispatch until Martin arrived. After Martin arrived, the district court found that Martin began diligently working on the citation while Norris' K-9 performed an exterior sniff search of the rental car. Finally, the district court determined that all of these activities occurred within 15 minutes of the initial car stop. Norris' body camera video, admitted into evidence at the hearing without objection, corroborates all the district court's findings.

All of Norris' activities were directly related to his "mission" during the traffic stop, which typically includes ordinary inquiries to (1) check the driver's license; (2) determine whether there are outstanding warrants against the driver; and (3) inspect the vehicle's registration and proof of insurance. See *Schooler*, 308 Kan. at 345-46. Stated differently, any amount of time it took for Norris to perform the sniff search "overlapped" his performance of the tasks necessary to complete the mission of the traffic stop. See 308 Kan. at 350. Norris and Martin were "continuously engaged" in the routine duties of the traffic stop up to the point that the dog alerted to drugs in Abigail's car. See 308 Kan. at 350.

We again conclude Norris did not measurably extend the duration of the traffic stop to conduct an exterior K-9 sniff search of Abigail's vehicle. Because Norris conducted the K-9 sniff search and located the contraband without measurably extending the duration of the initial traffic stop, we need not address whether he had reasonable suspicion of additional criminal activity to extend the scope of the stop. For these reasons, we conclude the district court did not err in denying Abigail's motion to suppress the evidence.

Affirmed.