In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-2105

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JANHOI COLE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:18-cr-30038-RM-TSH-1 — **Richard Mills**, *Judge.*

ARGUED JANUARY 19, 2021 — DECIDED APRIL 16, 2021

Before ROVNER, HAMILTON, and ST. EVE, *Circuit Judges.*

HAMILTON, *Circuit Judge.* In this appeal we deal with a pretextual traffic stop for purposes of drug interdiction. Even assuming that the stop was permissible at the outset, the record shows that the officer prolonged the stop by questioning the driver at length on subjects going well beyond the legal justification for the stop. Under *Rodriguez v. United States*, 575 U.S.

348 (2015), prolonging the stop violated the Fourth Amendment and requires suppression of evidence found much later as a result of the actions that prolonged the stop.

I.  *The Traffic Stop and Later Search*

On June 25, 2018, Illinois State Trooper Clayton Chapman was on highway patrol duties and received a message from Deputy Sheriff Derek Suttles about a car that he found suspicious. A Volkswagen hatchback sedan with California license plates was headed east toward Trooper Chapman on Interstate 72. Deputy Suttles reported that the Volkswagen was driving roughly 50 to 55 miles per hour where the speed limit was 70 miles per hour.

Trooper Chapman spotted the Volkswagen, driven by defendant Janhoi Cole, and trailed him with the intent to catch him in a traffic violation to provide a pretext for a roadside stop. That opportunity came after Interstate 72 merged with Interstate 55. In the merging traffic, another car cut off the Volkswagen. Trooper Chapman believed that the Volkswagen trailed the car that cut it off at an unreasonably close distance, in violation of the Illinois Vehicle Code. See 625 ILCS 5/11-710 ("The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway."). Trooper Chapman pulled Mr. Cole over to the partially unpaved shoulder lane, requested his driver's license and vehicle registration, and ordered him to exit the Volkswagen and sit in the front seat of the police cruiser.

This initial roadside stop lasted ten minutes. It included an eight-and-a-half-minute conversation between Trooper

Chapman and Mr. Cole in the police cruiser. Trooper Chapman used about six minutes of that initial conversation to question Mr. Cole about his state of residence, employment, travel history, travel plans, vehicle history, and registration information. Mr. Cole said that he was a traveling chef who split his time between New York, Los Angeles (where his girlfriend lived and the car was registered), and Maryland (where he was presently employed). He claimed to be on a long road trip from Maryland to Cincinnati to Colorado, and back. About eight minutes into the stop, Trooper Chapman told Mr. Cole that he would get off with a warning. But Trooper Chapman said that he preferred to go to a nearby gas station to complete the warning paperwork because he was concerned for their safety on the unprotected shoulder. That was not entirely true. Trooper Chapman testified later that he had already decided that he was not going to let Mr. Cole go until he had somehow managed to search the car for drugs. In response, Mr. Cole said he wanted to get on his way as soon as possible and would go only if he had to. Trooper Chapman made clear that Mr. Cole had no choice. Each drove in his respective car to the gas station. On the drive over, Trooper Chapman radioed to request a drug-sniffing dog.

After they arrived at the gas station, Trooper Chapman requested for the first time Mr. Cole's proof of insurance. Trooper Chapman then learned over the radio that Mr. Cole had been arrested for drug crimes fifteen years earlier. Trooper Chapman continued to interrogate Mr. Cole in a faux-casual manner, about his car, itinerary, travel plans, and residence. Mr. Cole's answers became increasingly contradictory and incoherent. He vacillated about whom he visited in Colorado, how long he had been on the road, and how he had the car insured and registered remotely (suggesting he sent

two different girlfriends to "one of those places" to fill out different parts of the paperwork). Upon finishing the warning, over thirty minutes after he first pulled Mr. Cole over, Trooper Chapman informed Mr. Cole that he was not free to leave because he suspected Mr. Cole was transporting drugs. The drug-sniffing dog arrived ten minutes later and quickly alerted to the presence of drugs. Trooper Chapman found several kilograms of methamphetamine and heroin in a hidden compartment and arrested Mr. Cole.

Mr. Cole was indicted on two counts of possessing controlled substances with intent to distribute. He moved to suppress the evidence against him on the ground that it was gathered in violation of the Fourth Amendment. He claimed that Trooper Chapman did not actually observe any traffic violations so that the stop was unlawful from the beginning. He also asserted that Trooper Chapman prolonged the stop without justification in violation of *Rodriguez v. United States*, 575 U.S. 348 (2015).

Trooper Chapman, Deputy Suttles, and Mr. Cole testified at a suppression hearing about the stop. Trooper Chapman testified that he saw Mr. Cole follow the car ahead of him too closely. He also conceded that issuing a warning normally takes only about 15 minutes and that he delayed part of his investigation. Even before he stopped Mr. Cole, Trooper Chapman had his vehicle registration and driver's license information, and he knew that insurance information was on file.

Relying heavily on a recording from Trooper Chapman's dashboard camera, the magistrate judge's written report and recommendation credited Trooper Chapman's version of the

tailgate over Mr. Cole's and concluded that Trooper Chapman had probable cause to stop Mr. Cole for following too closely. The judge also concluded that by the end of the roadside interrogation ten minutes into the stop, Trooper Chapman had a reasonable suspicion that Mr. Cole was a drug courier, justifying the further delays until the arrival of the dog 30 minutes later. The magistrate judge did not address directly the point that we think is decisive under *Rodriguez*, whether Trooper Chapman prolonged the stop in those first ten minutes by using the time to question Mr. Cole on topics unrelated to the constitutionally permissible, but pretextual, basis for the stop. After the district judge overruled his objections to the magistrate judge's recommendation that the motion to suppress be denied, Mr. Cole pleaded guilty to two counts of possessing a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1), reserving his right to appeal the suppression issues. He was sentenced to 74 months in prison.

II. *Analysis*

This appeal takes us to the niche in Fourth Amendment law governing pretextual traffic stops. The Fourth Amendment forbids "unreasonable searches and seizures," and courts generally must exclude evidence recovered in a search or seizure that violated the Constitution. *United States v. Simon*, 937 F.3d 820, 828 (7th Cir. 2019). When faced with the appeal of a motion to suppress decided after an evidentiary hearing, we review the district court's legal conclusions de novo and findings of fact for clear error. *United States v. Wilbourn*, 799 F.3d 900, 908 (7th Cir. 2015).

Police officers may "seize" (stop and detain) drivers, but only where such a stop is reasonable under the Fourth

Amendment. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). A full-blown arrest must be supported by probable cause. See *Martin v. Marinez*, 934 F.3d 594, 598 (7th Cir. 2019), citing *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). A lesser seizure, such as a brief, investigatory stop, may be based on a mere reasonable suspicion, supported by "specific and articulable facts," that the subject is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

Though reasonable suspicion is a lower standard than probable cause, it must still be *reasonable*—a *Terry* stop requires more than curiosity, inchoate suspicion, or a hunch. *United States v. Rodriguez-Escalera*, 884 F.3d 661, 668 (7th Cir. 2018); *United States v. Paniagua-Garcia*, 813 F.3d 1013, 1014 (7th Cir. 2016) (a "mere possibility" of unlawful activity is not "enough to create a reasonable suspicion of a criminal act"); see generally *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (suspicion must be "particularized and objective"). Traffic stops, due to their relative brevity, are usually analyzed under the constitutional framework for *Terry* stops as opposed to formal arrests. *Rodriguez*, 575 U.S. at 354, quoting *Knowles v. Iowa*, 525 U.S. 113, 117, 119 (1998).

The constitutional reasonableness of traffic stops does not depend on the real motives of the officers involved. In *Whren v. United States*, 517 U.S. 806, 818–19 (1996), the Supreme Court held that pretextual stops for minor traffic violations do not run afoul of the Fourth Amendment so long as the officer has probable cause for the driving violation.

Pretextual traffic stops are common in drug interdiction efforts, and they seem to be easy to initiate lawfully. As then-Attorney General Robert Jackson said long ago, "We know that no local police force can strictly enforce the traffic laws,

or it would arrest half the driving population on any given morning." Robert Jackson, *The Federal Prosecutor*, Address Delivered at the Second Annual Conference of United States Attorneys (April 1, 1940), quoted in *Morrison v. Olson*, 487 U.S. 654, 727–28 (1988) (Scalia, J., dissenting). Yet there are limits. One of the most important is imposed by time and the purpose that makes the stop lawful in the first place. A seizure that is "lawful at its inception" can violate the Fourth Amendment if it is "prolonged beyond the time reasonably required to complete" the initial mission of the stop. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

Most recently, the Supreme Court explained that a "police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez*, 575 U.S. at 350. During a traffic stop, the police officer must stick to the "mission" of the seizure: ensuring road safety, "determining whether to issue a traffic ticket, … checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355. An officer may not prolong the stop, "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* In determining whether an officer had reasonable suspicion to justify prolonging a traffic stop, we consider "the totality of the circumstances" and ask whether the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Rodriguez-Escalera*, 884 F.3d at 668 (quotation marks omitted), quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981), and *Terry*, 392 U.S. at 21.

A. *The Initial Stop*

We proceed chronologically, considering first Trooper Chapman's initial stop and then the roadside questioning. Trooper Chapman first seized Mr. Cole by pulling him over for tailgating. We see no sound basis for overturning the district court's conclusion that Trooper Chapman had probable cause to do so, thus permitting the pretextual stop at the outset. The dashboard camera's recording of the asserted violation was taken from a distance, and it is grainy, with a partially obstructed view. The magistrate judge did not clearly err in crediting Trooper Chapman's testimony that he saw what was in his judgment a violation and in treating that judgment as objectively reasonable. See *Simon*, 937 F.3d at 829 ("If an officer reasonably thinks he sees a driver commit a traffic infraction, that is a sufficient basis to pull him over without violating the Constitution."). Based on the video and the magistrate judge's credibility determinations, we assume for purposes of this appeal that Trooper Chapman had probable cause to initiate the traffic stop for tailgating.

B. *Interrogation at the Side of the Road*

Under *Rodriguez* and *Caballes*, however, Trooper Chapman's legal authority to pull Mr. Cole over did not give him license to detain Mr. Cole for a speculative search or interrogation for "evidence of ordinary criminal wrongdoing." *Rodriguez*, 575 U.S. at 355, quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000). Police detention, however brief, is not a "minor inconvenience or petty indignity." *Terry*, 392 U.S. at 10, 16. The Supreme Court has "emphatically reject[ed]" the notion that the Constitution does not strictly regulate an officer's actions when he "accosts an individual and restrains his freedom to walk away." *Id.* at 16.

The implicit or explicit threat of violence hangs over even routine and constitutionally permissible seizures. "We are mindful that police, in carrying out their duties, often must react to potential threats quickly and under difficult and uncertain circumstances." *United States v. Howell*, 958 F.3d 589, 602 (7th Cir. 2020). Thus, during a *Terry* stop, an officer may in some cases frisk a suspect to search for weapons. *Terry*, 392 U.S. at 16–17, 30 (describing "a careful exploration of the outer surfaces of a person's clothing all over his or her body" and condoning a search because it did not reach "under the outer surface of [defendants'] garments"). The officer may also order a driver out of his car, even if, as here, that requires the driver to exit near moving traffic. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (per curiam).

If a suspect refuses to submit to any of these orders or an officer fears for her safety, the officer may use reasonable (and sometimes even deadly) force to make him submit. E.g., *Catlin v. City of Wheaton*, 574 F.3d 361, 365–66 (7th Cir. 2009) (no constitutional violation where police forced wrong person off road, tossed him to the side of the road, tackled him, and held his face in the ground while handcuffing him—even though quick license plate check would have revealed the mistaken identity); *Tom v. Voida*, 963 F.2d 952, 954 (7th Cir. 1992) (no constitutional violation where attempt to make justified *Terry* stop escalated until officer fatally shot subject); see also *Scott v. Harris*, 550 U.S. 372, 381 (2007) (no constitutional violation where deadly force was used against fleeing driver where initial purpose of attempted stop was routine traffic violation).

Here, the evidence, including the trooper's own testimony, shows clearly that Trooper Chapman slow-walked his work throughout the stop, though the critical constitutional

violation came in those first ten minutes. Even before stopping Mr. Cole, Trooper Chapman had already ascertained that the Volkswagen was registered to him and that the car had insurance on file. Of the eight and a half minutes that Trooper Chapman had Mr. Cole in his police cruiser on the side of the road, he spent six minutes questioning Mr. Cole about topics that he already knew the answers to or went beyond the limited topics justified by the traffic stop: "determining whether to issue a traffic ticket, … checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355.

Next, Trooper Chapman demanded that they drive to a nearby gas station—he claimed for officer safety, but Mr. Cole argues that Trooper Chapman wanted a few minutes alone to call in a drug-sniffing dog. Then, after the warning was complete, Trooper Chapman held Mr. Cole an additional ten minutes while they waited for a drug-sniffing dog to arrive.

We focus on the initial roadside questioning, which prolonged the stop without the reasonable, articulable suspicion necessary to justify this delay. At the outset of the seizure, Trooper Chapman had at best only a hunch that Mr. Cole might be a drug courier. Most of what he knew simply came from Deputy Suttles' tip, but a police officer cannot launder such flimsy speculation into reasonable suspicion through the mere act of voicing a hunch to another officer. *United States v. Street*, 917 F.3d 586, 596–97 (7th Cir. 2019) ("To rely on collective knowledge to support a stop … the officer providing the information … must have facts supporting the level of suspicion required.") (quotation marks and citation omitted); see also *Navarette v. California*, 572 U.S. 393, 401 (2014), quoting

*Terry*, 392 U.S. at 30 ("Even a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.'").

The government claims that other facts of which Trooper Chapman was aware at the outset of the stop allowed this hunch to hobble across the line into the territory of reasonable suspicion: Mr. Cole was from a large American city, drove cautiously on a major interstate highway, owned a popular brand of car, sat with good posture, and had empty fast-food wrappers in the passenger compartment. Those are perfectly normal facts that could easily be true of millions of law-abiding Americans. "Without more, a description that applies to large numbers of people will not justify the seizure of a particular individual." *Street*, 917 F.3d at 594; see also *Kansas v. Glover*, 589 U.S. —, —, 140 S. Ct. 1183, 1190 (2020) (traffic stops do not "allow officers to stop drivers whose conduct is no different from any other driver's"); *United States v. Flores*, 798 F.3d 645, 649 (7th Cir. 2015) ("A suspicion so broad that would permit the police to stop a substantial portion of the lawfully driving public … is not reasonable.").

The government also emphasizes the fact that Mr. Cole was driving *below* the speed limit. While a violation of a traffic law may justify a traffic stop, we have rejected the startling idea that *obeying* traffic laws may also justify a stop: "The mere lawful operation of a motor vehicle should not be considered suspicious activity absent extraordinary circumstances." *United States v. Ingrao*, 897 F.2d 860, 865 (7th Cir.

1990) (reversing denial of motion to suppress where arrest had been based in part on defendant's cautious driving).[1]

So, armed with little more than Deputy Suttles' guess, Trooper Chapman had no reasonable suspicion of wrongdoing that could support a seizure, a restraint on Mr. Cole's liberty. Accordingly, Trooper Chapman's mission was confined to executing the traffic stop: determining whether to issue a traffic ticket, checking Mr. Cole's authority to drive the Volkswagen, searching for outstanding warrants, and any other tasks needed to ensure road safety. See *Rodriguez*, 575 U.S. at 355. If Trooper Chapman developed grounds for continued detention *while carrying out those permissible tasks*, he could have justified continued detention. That's the logic for using constitutionally permissible but pretextual stops in the first place. But that's not what happened.

Instead, Trooper Chapman went beyond that permissible scope almost immediately. Of the first eight and a half minutes in the cruiser on the side of the road, he spent about six minutes interrogating Mr. Cole about matters unrelated to tailgating or road safety. After informing Mr. Cole he had been following too closely, Trooper Chapman asked where

---

[1] The dissenting opinion asserts that Mr. Cole's nervous demeanor throughout the stop contributed to Trooper Chapman's growing reasonable suspicion. This misunderstands the record. Trooper Chapman testified, "A lot of people are nervous when they get stopped by the police until they just realize they're going to be issued a warning; it won't be any fine or court date. And then that nervousness will dissipate. In this case, the nervousness, if anything, increased and was sustained throughout the duration of the traffic stop." Tr. at 71–72. In other words, Mr. Cole's nervousness was a perfectly normal response to a police stop at the beginning, and it did not on its own provide a basis for prolonging the roadside detention for the extended inquiry into Mr. Cole's itinerary and travel plans.

Mr. Cole lived, since his car was validly registered in California, though he was validly licensed to drive in Arizona. Mr. Cole explained that he used to work in Arizona and kept the license for convenience because the expiration date was still a long way off. Mr. Cole also explained that he is a travelling chef who splits his time between New York, Maryland, and California. Trooper Chapman pressed Mr. Cole repeatedly on where he was headed (Maryland, for work), where he worked (Maryland, where he worked as a personal chef), and who his employer was (a former professional football player). Trooper Chapman asked again where Mr. Cole was headed, and he again replied Maryland. Trooper Chapman then asked where Mr. Cole's trip had started, and Mr. Cole responded that he had met up with friends and family in Colorado to visit "the springs." Trooper Chapman pressed what the *origin* of the trip was, and Mr. Cole explained that he stopped in Cincinnati on his way out from Maryland to Colorado. Trooper Chapman asked how long "this trip" had taken him, and Mr. Cole responded four days but clarified that he only stopped in Cincinnati because he was passing through. Trooper Chapman continued to question Mr. Cole about his car, registration, and residence.[2]

These questions did nothing to advance the limited road and driver safety missions that Trooper Chapman was legally

---

[2] We tally the length of impermissible questioning during this roadside interrogation slightly differently than the dissenting opinion. But under the dissent's accounting, Trooper Chapman still prolonged the stop by several minutes, "even though *any* delay … is unconstitutional absent independent reasonable suspicion." See *Simon*, 937 F.3d at 833; see also *Rodriguez*, 575 U.S. at 356–57 (de minimis delays violate the Constitution); *United States v. Clark*, 902 F.3d 404, 410 n.4 (3d Cir. 2018).

authorized to pursue. Mr. Cole's profession as a California-based traveling personal chef employed part-time in Maryland to a former professional footballer simply had nothing to do with whether he was safe to continue driving. And Trooper Chapman knew that Mr. Cole was authorized to drive the Volkswagen when he observed that Mr. Cole's name matched the registration mere seconds into the ten-minute-long roadside encounter.

It does not matter here whether, at some later point, Mr. Cole's answers became suspicious. The critical point under *Rodriguez* is that it was unconstitutional to prolong the stop to ask those questions to begin with. *United States v. Lopez*, 907 F.3d 472, 486–87 (7th Cir. 2018) (suppressing evidence gathered following questioning that prolonged seizure); see also *United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002) (en banc), citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985) ("Questioning that prolongs the detention, yet cannot be justified by the purpose of such an investigatory stop, is unreasonable under the fourth amendment.").

This is where the magistrate judge erred. Even if we assume that issuing a warning typically takes 15 minutes, as Trooper Chapman testified, that does not mean that an officer has 15 free minutes to investigate other crimes before starting the substance of the stop in the hope that the questioning will unearth signs of other wrongdoing to justify still more detention and more investigation, such as waiting for a busy drug-sniffing dog to arrive. See *United States v. Garcia*, 376 F.3d 648, 650 (7th Cir. 2004) ("[T]he reasonableness of a search or seizure depends on what actually happens rather than what could have happened.").

If the video left any doubts that Trooper Chapman prolonged the stop and delayed executing his lawful mission to ask his off-topic questions, he admitted as much at the suppression hearing. Recall that he failed to collect Mr. Cole's insurance information at the outset of the stop, though that is an integral piece of information about Mr. Cole's authorization to drive. Trooper Chapman even admitted that the insurance information he had received prior to the stop was incomplete. In fact, collecting Mr. Cole's proof of insurance is one of the few things the Supreme Court has endorsed as within the mission of a normal traffic stop. *Rodriguez*, 575 U.S. at 355.[3]

---

[3] The dissenting opinion relies in part on the timing of Mr. Cole's purchase of insurance to justify Trooper Chapman's drug-trafficking suspicions, well before he collected and verified the insurance information. There is no evidence that Trooper Chapman had the information about timing before he asked Mr. Cole for insurance information after arriving at the gas station. Even if we assume that Trooper Chapman knew earlier about the allegedly suspicious timing, however, he said at the suppression hearing that he doubted about the quality of the initial data and could not rely on it, and that he did not learn the full details of Mr. Cole's insurance and its timing until after they had arrived at the gas station. Tr. 68. Whether the initial summary available to Trooper Chapman before the stop contributed to his suspicion is doubtful but ultimately irrelevant. We assume that Trooper Chapman reasonably suspected Mr. Cole was trafficking drugs by the time he ordered Mr. Cole to drive to the gas station. We therefore need not determine whether the magistrate judge erred in concluding that the recent insurance registration contributed to Trooper Chapman's initial suspicions despite: Trooper Chapman's testimony (Tr. 68), the court's acknowledgment that "Trooper Chapman testified that the computer record about insurance was not reliable" (Dkt. 30 at 4), Trooper Chapman's arrest report, which did not mention the insurance as informing his suspicions (Dkt. 24, Ex. 1 at 1) and did not mention insurance until reporting the questioning after he had called for a dog (*id*. at 4), and both parties' respective descriptions of the traffic stop in the district court, where neither side asserted that Trooper Chapman learned anything

When asked what accounted for that delay, Trooper Chapman admitted that he delayed collecting those necessary materials (for investigating the tailgating and Mr. Cole's driving) because he "was trying to piece together Mr. Cole's story, which was—as we all heard, was kind of inconsistent. Changed each time." Tr. 35.

With respect, that is not how this works. Under the Constitution, drivers do not need "stories" to travel on interstate highways. *Rodriguez* made clear that police officers may not use the implicit threat of state-sanctioned violence to hold someone against his will to extract details about his personal life, absent reasonable suspicion of criminal activity. Even if Mr. Cole's responses to Trooper Chapman's later questions contradicted the answers to the earlier questions, that could not justify prolonging the stop to ask and re-ask the questions in the first place.

The government invites us to adopt a different rule, under which police officers may insist that a driver who is lawfully stopped for a minor and routine traffic infraction be able to convince the officer that she is not a criminal. The government's theory is that itinerary questions by definition fall within the scope of a traffic stop because they are road-related, so there was no constitutional violation despite the evidence that Trooper Chapman prolonged the stop. For support, the government cites several out-of-circuit cases approving of itinerary questions, all but one of which predate *Rodriguez*, and dicta from our decision in *United States v. Lewis*, 920 F.3d 483 (7th Cir. 2019).

---

about Mr. Cole's insurance before they drove to the gas station (Dkt. 24 at 5; Dkt. 29 at 5—6).

The Supreme Court's most recent decision on pretextual traffic stops pointedly declined to categorically permit itinerary questioning as central to traffic stops' missions. The officer in *Rodriguez* had asked the driver and passenger about their itinerary, 575 U.S. at 351, but the Court left that out of the topics typically permissible because they help ensure that vehicles are "operated safely and responsibly." *Id.* at 355.

Courts applying *Rodriguez* thus must "inquire whether, on the facts of the particular case, [itinerary] questioning is within the traffic stop's mission" and if not, determine if the questioning impermissibly lengthened the stop. Wayne R. LaFave, 4 Search & Seizure § 9.3(d) (6th ed 2020); see also *United States v. Gomez-Arzate*, 981 F.3d 832, 836, 840 (10th Cir. 2020) (a few minutes of itinerary questioning that prolonged an already completed stop violated Constitution, but extended inquiry into car ownership may be permissible where driver is not listed on registration and cannot say who owns vehicle; affirming denial of suppression on other grounds); *United States v. Callison*, 436 F. Supp. 3d 1218, 1226 (S.D. Iowa 2020) (suppressing evidence; itinerary questions irrelevant where defendant had been stopped for having an improperly lit license plate), appeal pending, No. 20-1398 (8th Cir. Feb. 27, 2020); *State v. Jimenez*, 420 P.3d 464, 475–76, 308 Kan. 315, 328–29 (2018) (affirming suppression where itinerary questions prolonged stop for following too closely, noting that courts must guard against "mission creep" in pretextual traffic stops); cf. *United States v. Dion*, 859 F.3d 114, 125 (1st Cir. 2017) (assuming that pre-*Rodriguez* case law about itinerary questioning survived because defendant conceded it); *United*

*States v. Murillo-Salgado*, 854 F.3d 407, 416 (8th Cir. 2017) (declining to consider *Rodriguez*'s impact on circuit case law because it did not affect the outcome).[4]

Contrary to the government's contention, our decision in *Lewis* did not hold that an officer may prolong a stop indefinitely to ask increasingly invasive and repetitive questions about a driver's travels and employer—nor could it have, given *Rodriguez*. In fact, *Lewis*'s holding affirming denial of suppression is consistent with the outcome here, notwithstanding similarities between the cases. In *Lewis*, the defendant was also pulled over for tailgating, 920 F.3d at 487, and the

---

[4] The government's other out-of-circuit cases all predate *Rodriguez*. A close examination of other circuits' approaches demonstrates that they did not categorically allow lengthy itinerary questioning even before *Rodriguez*. The Eighth Circuit did not apply consistent tests as to when itinerary questioning that prolongs a stop is permissible, and in any event *Rodriguez* expressly abrogated the Eighth Circuit's general approach to prolonged traffic stops. Compare *United States v. Bowman*, 660 F.3d 338, 343 (8th Cir. 2011) (reasoning that a 14-minute stop during which itinerary questions were asked was not too long, but granting that a 28-minute stop may violate the Constitution), with *United States v. $404,905.00 in United States Currency*, 182 F.3d 643, 647 (8th Cir. 1999), abrogated on other grounds, *Rodriguez*, 575 U.S. 348, (allowing officer to ask about driver's destination, route, and purpose only "during th[e] process" of completing "computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning"). The government's citation from the Third Circuit is hesitant, and that circuit's current approach does not help the government's case. Compare *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003) (acknowledging before *Rodriguez* that itinerary questions are "ordinarily" part of an officer's mission), with *United States v. Clark*, 902 F.3d 404, 408, 410–11 (3d Cir. 2018) (confirming that *Rodriguez* calls for fact-sensitive inquiry as to whether ordinarily permissible questions actually advance a stop's mission when they measurably prolong a stop).

arresting officer asked itinerary and personal questions. The critical difference is that he did so while he was also filling out the necessary paperwork. *Id.* at 492. The officer in *Lewis* completed the written warning and dog sniff within eleven and twelve minutes, respectively. *Id.*

We described several possible routes to affirming the district court's denial of Lewis's suppression motion. We concluded that "the biggest problem with Lewis's argument" was that he failed to show that the district court clearly erred in concluding that the officer's questioning simply did not prolong the stop. The video showed the officer filled out paperwork throughout the conversation and did so expeditiously. *Id.*

In this case, however, the video showed, and Trooper Chapman admitted, that he delayed commencing important, permissible parts of his investigation until after questioning Mr. Cole about his "story" for six minutes, roughly the same amount of time that the Supreme Court held to be an unconstitutional delay in *Rodriguez*. 575 U.S. at 352. This critical difference distinguishes this case from *Lewis*. Mr. Cole, unlike Mr. Lewis, has shown that "these exchanges prolonged the process of issuing the warning." *Lewis*, 920 F.3d at 492.

Moreover, Trooper Chapman admitted that the stop took twice as long as it should have, dragging on to about 30 minutes when it should have taken 15 minutes. Recall that Trooper Chapman already had Mr. Cole's license and registration information even before the stop began. Trooper Chapman also admitted that he failed to commence key aspects of his investigation about Mr. Cole's legal authority to drive until 17 minutes after he first pulled Mr. Cole over, well after the initial roadside encounter at issue here had ended.

When asked what accounted for this delay, Trooper Chapman did not even gesture toward a constitutional justification, such as investigation of the traffic violation or officer safety. Instead, he admitted that he had held off completing the substance of the stop until he had pressed Mr. Cole about his "story." See Tr. 35. Simply put, whereas the officer in *Lewis* completed the warning within eleven minutes, Trooper Chapman had not even collected all of Mr. Cole's paperwork by that point, and he did not even attempt to account for that delay in constitutionally permissible terms.[5]

To be sure, we were rightly incredulous in *Lewis* at the prospect that a police officer who opens a traffic stop with a brief question such as, "How are you doing?" or, "Where are you going today?" violates the Constitution. That dicta cited two pre-*Rodriguez* cases that each concerned the constitutionality of a seizure when a police officer asked a single, pointed question aimed at detecting drug transport; in each case we held that such brief inquiries did not prolong the respective stops. See generally *Childs*, 277 F.3d 947; *United States v. Muriel*, 418 F.3d 720 (7th Cir. 2005). To use *Rodriguez*'s language, the seizures in *Childs* and *Muriel* remained lawful because the isolated question did not "measurably extend the duration of the

---

[5] The government further argues that we should infer from a beeping noise in the background of the dashboard camera video during the roadside questioning that Trooper Chapman was doing some kind of permissible investigation or preparation while asking questions. That argument is refuted by several aspects of Trooper Chapman's testimony, including his admissions that he delayed executing his permissible mission and that issuing a warning generally takes about 15 minutes. See also *Lewis*, 920 F.3d at 492 (Illinois state trooper completed warning within eleven minutes while also questioning driver).

stop." See *Rodriguez*, 575 U.S. at 355, quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).[6]

*Lewis*'s invocation of these decisions in discussing whether an officer may inquire as to a driver's destination clarifies that our dicta referred to a brief context-setting question as opposed to a lengthy interrogation such as what happened here. Under our precedents, we expect it will be almost impossible for a defendant to demonstrate that one or two broad questions at the beginning of a traffic stop were irrelevant to an officer's constitutional mission and measurably extended the duration of the stop. See *Rodriguez*, 575 U.S. at 355; see also, e.g., *Simon*, 937 F.3d at 833 (affirming district court's factual finding that unrelated inquiry did not measurably prolong stop at all, but noting that constitutionality of stop would be in question if suspicionless checks prolonged stop); cf. *Clark*, 902 F.3d at 409 n.2, 410–11 (affirming suppression of evidence based on district court's factual finding that 20 seconds of irrelevant questioning *after an officer had completed his mission* measurably prolonged stop); *United States v. Cone*, 868 F.3d 1150, 1155 (10th Cir. 2017) (affirming denial of suppression because there was no causal connection between brief itinerary questions and discovery of firearm that was visible in car's cabin).

---

[6] To the extent that those decisions relied on an alternate cost-benefit rationale to excuse officers' de minimis but quantifiable delays in the service of drug interdiction, the Supreme Court flatly rejected that reasoning in *Rodriguez*. 575 U.S. at 349, 356. Our subsequent cases recognize as much. E.g., *Lopez*, 907 F.3d at 486 ("a 15-minute stop would be too long if the investigation justifying the stop finished at the 14-minute mark").

*Lewis* simply did not pronounce broadly on the permissibility of extended itinerary questioning, even in dicta. We explicitly avoided making such a conclusion when we noted that Mr. Lewis's "biggest" problem was the ambiguous evidence of delay he brought on appeal, not that our precedents conclusively foreclosed his claim as a matter of law. See *Lewis*, 920 at 492. And in any event, the government's argument here on the itinerary questions ignores the fact that Trooper Chapman also dwelled on Mr. Cole's registration, which he knew to be in good order, as well as residence, chef jobs, vehicle history, and so forth. See *Gomez-Arzate*, 981 F.3d at 836, 840 (prolonging a stop to conduct redundant or superfluous checks violates the Fourth Amendment); *Clark*, 902 F.3d at 409 n.2, 410–11 (similar); *United States v. Gorman*, 859 F.3d 706, 715 (9th Cir. 2017) (half-hour stop violated Fourth Amendment where most of the duration of the stop occurred after the officer learned that the driver's registration was in good order); see also *United States v. Cortez*, 965 F.3d 827, 839 (10th Cir. 2020) (questioning about driver's profession and where she stays while traveling was outside the scope of traffic stop; affirming suppression on other grounds).

To be clear, we are not drawing a line that says itinerary questions are never permissible. Under the Fourth Amendment and *Rodriguez*, the question is reasonableness under the circumstances that made the stop constitutional in the first place. "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But contrary to Justice ALITO's suggestion … he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." 575 U.S. at 355.

In some situations, basic information about how long a driver has been on the road and where the driver is headed can inform an officer's investigation into whether a traffic violation such as speeding in fact occurred and a decision to warn, ticket, or arrest: "Q: What's the rush, sir? A: My wife is in labor." See *United States v. Brigham*, 382 F.3d 500, 508 & n.6 (5th Cir. 2001) (en banc). It is not hard to imagine instances where even detailed itinerary questioning could fall squarely within an officer's mission in executing a traffic stop. For example, in furtherance of road safety, an officer concerned that a driver is exhibiting signs of fatigue may be permitted to prolong a stop to ask questions about how long she had been on the road. See *Jimenez*, 420 P.3d at 475, 308 Kan. at 329. We also do not read *Rodriguez* as barring an officer from extending a stop to make conversation with an erratic driver where the officer is reasonably looking for signs of impairment. Cf. *Navarette*, 572 U.S. at 402–03. And nothing stops police officers from investigating the infraction that actually motivated the stop.

This circuit's approach accordingly remains in line with the other circuits that have addressed the propriety of itinerary questioning after *Rodriguez*. As we explained in *Lewis*, police officers may ask about whatever they want, so long as they do not prolong the stop with their questioning; that is what the Supreme Court explained in *Caballes* and *Rodriguez*. See also *Childs*, 277 F.3d at 950. Officers may "ordinarily" indulge in "some" itinerary questioning, *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020), but itinerary questions and the like do not necessarily fall within the scope of a traffic stop, *Rodriguez*, 575 U.S. at 355, and ordinarily acceptable questions may impermissibly prolong a stop based on the specific facts of a given case. See also *Clark*, 902 F.3d at 410–

11. Though introductory context-setting questions about a driver's itinerary and registration "rarely offend our Fourth Amendment jurisprudence," *United States v. Collazo*, 818 F.3d 247, 258 (6th Cir. 2016), the interrogation here went well beyond the permissible scope of the stop given the clear-cut six-minute delay, the overall context of an unusually long traffic stop, and Trooper Chapman's failure to provide a permissible justification for the easily observable delays.[7]

The reasonableness standard of the Fourth Amendment permits police officers substantial flexibility in how they perform their duties in a traffic stop. Here, however, the undisputed evidence shows that Trooper Chapman's pretext was paper-thin, and he prolonged the stop for at least six minutes. This case is ripe for decision without additional fact-finding because Trooper Chapman admitted that he held off on key aspects of his investigation and did not provide any constitutional justification for why this stop was so long or why he

---

[7] The dissenting opinion also cites *United States v. Cortez*, 965 F.3d 827, 839 (10th Cir. 2020), which observed that "an officer may generally inquire about a driver's travel plans … because travel plans typically are related to the purpose of the stop." (cleaned up). Neither the government nor the dissent hypothesize how the extended questioning here could have had anything to do with the infraction and stop—Mr. Cole's having followed too closely for several seconds after being cut off, notwithstanding otherwise proper driving under an extended period of observation. *Cortez* is also a problem for the government because it explained that many of Trooper Chapman's more invasive questions, including those related to employment, fall outside the routine bounds of a traffic stop. *Id.* And as discussed above, the Tenth Circuit has further clarified that even ordinarily acceptable travel questions can run afoul of the Fourth Amendment when they are irrelevant to the stop and prolong the detention. *Gomez-Arzate*, 981 F.3d at 840.

delayed during the initial roadside encounter. See *United States v. Evans*, 786 F.3d 779, 787 (9th Cir. 2015).[8]

We should not be surprised that there is a significant risk of "mission creep" where the stop is justified constitutionally by one limited purpose but is actually motivated by a different purpose. See *Jiminez*, 420 P.3d at 476, 308 Kan. at 329. In such cases, district courts must make the joint legal and factual determination of how long was reasonably necessary to execute the stop's permissible mission and then decide whether the stop's duration measurably exceeded that ceiling or the officer otherwise unreasonably prolonged the stop. Our

---

[8] The dissenting opinion characterizes this as wading into waiver-adjacent territory. To be sure, Mr. Cole's amended suppression motion was terse, but the rules against consideration of waived and forfeited arguments are not so narrow as to limit an appellant to his or her initial *focus*. Mr. Cole's suppression motion observed that ten minutes elapsed roadside, during which time Trooper Chapman asked itinerary questions, and then the dog sniff did not occur for another 30 minutes yet. Under *Rodriguez*, he asserted, all of these delays were unconstitutional. Dkt. 24 at 3, 9, 11. His argument was broad, and the government interpreted it as such. The government's equally terse response devoted valuable space to the propriety of itinerary questions and *Lewis*. Dkt. 25 at 8. Mr. Cole in fact developed a record on this point at the hearing, and the government failed to repair the damage during its cross-examination. The government's post-hearing brief elaborated on *Lewis*'s applicability. Dkt. 29 at 10. The magistrate judge likewise addressed the propriety and duration of the initial roadside encounter. Dkt. 30 at 23. The government did not ask us to resolve this appeal on a weak forfeiture argument. We need not second-guess its tactical decisions or ignore facts that were developed at the suppression hearing in response to the arguments that the parties made in their pre-hearing briefs. The evidence of Trooper Chapman's roadside activities is one-sided: the video showing several minutes of off-point interrogation, his admission that he held off parts of his traffic investigation until he had learned Mr. Cole's full story, and some beeping noises.

review of fact-finding is deferential. *E.g.*, *Simon*, 937 F.3d at 832 (deferring to district court's credibility determinations as to whether the officers prolonged a stop); *Lewis*, 920 F.3d at 492 (similar); see also *Rodriguez-Escalera*, 884 F.3d at 672 (affirming grant of motion to suppress based on factual findings, including those on credibility).

We need not consider the additional delays that took place during the gas station detour. The permissible scope and duration of investigations into reasonably suspicious behavior are highly fact-intensive and fluid, and when considering an obviously pretextual stop like this one, a court needs to stay focused in its analysis on the circumstances that make the stop constitutional in the first place. One of three things must happen during a *Terry* stop: "(1) the police gather enough information to develop probable cause and allow for continued detention, (2) the suspicions of the police are dispelled and they release the suspect, or (3) the suspicions of the police are *not* dispelled, yet the officers have not developed probable cause but must release the suspect because the length of the stop is about to become unreasonable." *United States v. Leo*, 792 F.3d 742, 751 (7th Cir. 2015) (internal citations to collected cases omitted). An officer who reasonably believes a driver is suspicious based on some ambiguous or conflicting statements may not detain the suspect indefinitely, lest the stop turn into "a de facto arrest that must be based on probable cause." See *id.*, quoting *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011). Because the initial portion of this stop was unconstitutional and was used to prolong the stop improperly, we need not address how the stop evolved over the entire hour.

Trooper Chapman measurably prolonged the stop by six minutes to investigate possible additional crimes without reasonable suspicion, and those actions led to discovery of the evidence against Mr. Cole. We REVERSE the denial of Mr. Cole's motion to suppress and REMAND the case for further proceedings where Mr. Cole may withdraw his guilty plea that was conditioned on the admissibility of the evidence against him obtained through the unlawful seizure and subsequent searches.

ST. EVE, *Circuit Judge*, dissenting. I would affirm the district court's denial of Cole's motion to suppress. Trooper Chapman developed reasonable suspicion that Cole was engaged in criminal activity less than nine minutes into the stop, following a brief and routine conversation about Cole's license, registration, and travel plans. That reasonable suspicion allowed Trooper Chapman to prolong the stop for the dog sniff, which uncovered drugs in Cole's car. The majority's holding to the contrary conflicts with our precedent, creates new limits on what officers can ask during *Terry* stops, and rests on a dubious factual finding that the district court never made. I respectfully dissent.

I.

As the majority recognizes, Trooper Chapman lawfully stopped Cole on the interstate for following too closely. Indeed, Cole himself conceded at oral argument that there is no basis for upsetting the district court's factual finding that he followed too closely. The central issue on appeal is whether the stop became unlawful at any point during the detention that followed the lawful stop.

A closer look at the factual record puts this issue in context. After stopping Cole, Trooper Chapman approached Cole's car and spoke to him for about 30 seconds at the passenger's side window. He retrieved Cole's license and registration and asked if Cole's license showed his current address. He then asked Cole to sit in his squad car so he could explain the purpose of the stop. Trooper Chapman testified that he asked Cole to sit in his squad car because he was having trouble hearing Cole, and for safety reasons because his body was exposed to traffic on the highway. He added that he "was

looking at the California registration, an Arizona driver's license, and all the other observations I made prior to that."

About a minute and a half into the stop, Cole entered the squad car. Cole asked why Trooper Chapman pulled him over. Trooper Chapman spent about a minute explaining the details of how Cole had followed another car too closely. Trooper Chapman then asked Cole about his Arizona driver's license and California license plate. Cole explained that he worked as a personal chef who traveled around the country for work. Trooper Chapman asked Cole when he got his license and what his first name was. These questions (and Cole's answers) lasted another minute. At that point (about four minutes into the stop), Trooper Chapman asked Cole where he was headed. He followed up with questions about Cole's job as a traveling chef and the details of Cole's trip. These questions lasted about two and a half minutes. Trooper Chapman then asked Cole about his car and current residence, apparently trying to make sense of the discrepancy between Cole's license (Arizona), registration (California), and current residence (Maryland). In Cole's telling, his job as a traveling chef explained the discrepancy. Trooper Chapman also asked Cole why he chose to drive, rather than fly. These additional questions (and Cole's answers) lasted two minutes and 20 seconds.

Less than nine minutes into the stop, Trooper Chapman told Cole that he was going to issue him a warning. He explained, though, that they would have to relocate to a gas station for safety reasons. Cole exited the car, and they both drove to the gas station. In total, the initial roadside detention lasted about ten minutes. Less than five minutes passed between when Trooper Chapman began asking Cole about his

travel plans and when he told him he would issue him a warning.

The district court concluded that Trooper Chapman had reasonable suspicion of other criminal activity by the time he decided to relocate the stop, at which point he was "clearly within the time reasonably needed to complete the traffic stop." I agree. It is undisputed in this case that issuing the warning alone would have taken 15 minutes. As such, the critical question is whether the traffic stop was "'prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).[1]

Based on the above facts, I would hold that Trooper Chapman had reasonable suspicion of other criminal activity when he told Cole he was going to issue him a warning—less than nine minutes into the stop. In response to Trooper Chapman's questions, Cole, an out-of-state motorist traveling on an interstate, told an implausible and evolving travel story about driving from Maryland to Cincinnati to multiple locations in Colorado and then to Illinois on his way back to Maryland—all in just four days. He originally said he spent two of the four days in Cincinnati alone, but he quickly changed his answer and said he just passed through Cincinnati. His story about Colorado also seemed to evolve. Initially, he said he

---

[1] I agree with the majority that an officer does not have "15 free minutes to investigate other crimes before starting the substance of the stop in the hope that the questioning will unearth signs of other wrongdoing to justify still more detention and more investigation." As I explain below, Trooper Chapman's questioning stayed within the permissible scope of the traffic stop.

met friends and family in "the springs." Then, he said he met some friends at the Springs and went to Boulder to visit a buddy. After that, he said he met some buddies in Colorado because one of them was getting a divorce. Trooper Chapman also testified that Cole was "extremely nervous." Cole himself commented on how nervous he was.[2] Beyond that, Cole's car insurance was only a few days old. Trooper Chapman testified that drug traffickers often insure cars for specific trips, rather than maintaining permanent insurance.[3] Finally, Cole offered a vague and confusing explanation for why he had an Arizona driver's license, a car registered in California, and a residence in Maryland.

Taken together and assessing the totality of the circumstances known to Trooper Chapman, these facts created reasonable suspicion that Cole was engaged in criminal activity. *See, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Our cases have … recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *United States v. Lewis*, 920 F.3d 483, 493 (7th Cir. 2019) (finding reasonable suspicion based on defendant's "unusually nervous" behavior, criminal history, and "suspiciously inconsistent"

---

[2] The majority cites a portion of Trooper Chapman's testimony for the proposition that Cole's nervousness was "perfectly normal" at the outset. But in the quoted testimony Trooper Chapman distinguished Cole's nervousness from the level of nervousness that most drivers exhibit when they are pulled over. Indeed, Trooper Chapman testified earlier in the hearing that Cole's level of nervousness was "consistent with other individuals that I've stopped that were involved in criminal activity."

[3] The majority claims that Trooper Chapman did not know about Cole's recent insurance purchase before relocating the stop to the gas station. But the district court found that he did, and Cole does not challenge that factual finding on appeal.

answers); *United States v. Ruiz*, 785 F.3d 1134, 1144 (7th Cir. 2015) (finding that an officer's suspicions were reasonably increased by the defendant's Texas driver's license and Wisconsin registration). I place no reliance on the many innocuous factors (e.g., Cole's compliance with the speed limit and good driving posture) that the government labels suspicious.

Because Trooper Chapman knew the above facts less than nine minutes into the stop, he had a lawful basis to prolong the stop for the dog sniff. *See Rodriguez*, 575 U.S. at 355 (holding an officer may not prolong a stop beyond the time reasonably required to complete it "absent the reasonable suspicion ordinarily demanded to justify detaining an individual"). And because Trooper Chapman had reasonable suspicion to prolong the stop less than nine minutes in, it does not matter that he ultimately issued the warning 30 minutes into the stop. *See id.*

## II.

The majority analyzes the stop differently. In its view, the stop became unlawful as soon as Trooper Chapman began asking Cole about his itinerary. In reaching this conclusion, the majority announces a new legal rule regarding travel-plan questions during a *Terry* stop that is at odds with our precedent and hamstrings law enforcement officers. The majority proclaims that Trooper Chapman's travel-plan questions "almost immediately" became impermissible because they were "unrelated to tailgating or road safety;" that the questions did not "advance the limited road and driver safety missions" that Trooper Chapman could pursue; and that they unreasonably "delayed" the "permissible parts of his investigation." This broad holding ignores our law on the permissibility of

travel-plan questions and imposes rigid, unreasonable boundaries on officers during traffic stops.

If Trooper Chapman's questioning had veered away from the traffic stop and into completely unrelated territory, I might agree with the majority that the stop here was unlawful. *See, e.g., United States v. Gomez*, 877 F.3d 76, 91–92 (2d Cir. 2017) (holding that a traffic stop was unlawful because the officer spent most of it asking questions about heroin trafficking); *see also Rodriguez*, 575 U.S. at 356 ("On-scene investigation into other crimes … detours from th[e] mission" of a traffic stop). But that is not what happened. Trooper Chapman asked Cole about his out-of-state license, out-of-state registration, and travel plans. These are acceptable inquiries that fall within the scope of a traffic stop.[4]

The Supreme Court has made clear that the Fourth Amendment permits an officer to inquire into "matters unrelated to the justification for the traffic stop" without converting "the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). In *Rodriguez*, the Court held that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (quoting *Caballes*, 543 U.S. at 407). "Beyond determining whether to issue a traffic ticket, an officer's

---

[4] Contrary to the majority's suggestion, the issue here is not whether "police officers may insist that a driver who is lawfully stopped for a minor and routine traffic infraction be able to convince the officer that she is not a criminal." The issue is whether basic travel-plan questions fall within the permissible scope of a traffic stop.

mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Id.* at 355 (quoting *Caballes*, 543 U.S. at 408). These ordinary inquires typically "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* These inquiries "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.*

*Rodriguez* did not address whether travel-plan questions fall within the "mission" of a traffic stop, but we and other circuits have held that they normally do. *Lewis*, 920 F.3d at 492 (rejecting the argument that "Where are we headed to today, sir?" was "irrelevant to a traffic stop"); *see also United States v. Cortez*, 965 F.3d 827, 838 (10th Cir. 2020) ("An officer may … inquire about the driver's travel plans and the identity of the individuals in the vehicle."); *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020) ("[S]ome questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop."); *United States v. Dion*, 859 F.3d 114, 125 (1st Cir. 2017) ("[O]ur case law allows an officer carrying out a routine traffic stop to request identification from the driver and to inquire into the driver's itinerary."); *United States v. Collazo*, 818 F.3d 247, 258 (6th Cir. 2016) ("Questions relating to travel plans … are the sorts of classic context-framing questions directed at the driver's conduct at the time of the stop that rarely offend our Fourth Amendment jurisprudence." (quoting *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012))).

And for good reason. Travel-plan questions comport with "the public's expectations" and normally relate to the purpose of a stop. *Cortez*, 965 F.3d at 839. Here, for example,

Cole's itinerary could inform why he was following too closely. *See id.* (reasoning that travel-plan questions "could cast light on why Cortez had been speeding, tying them to the initial justification for the stop"). Trooper Chapman's travel-plan questions were also closely related to his permissible questions about Cole's possession of an Arizona license and California registration while traveling on an Illinois interstate. *See Rodriguez*, 575 U.S. at 355. More broadly, the command of the Fourth Amendment is reasonableness. Our "object in implementing its command of reasonableness is to draw standards sufficiently clear and simple to be applied with a fair prospect of surviving judicial second-guessing months and years after an arrest or search is made." *Atwater v. City of Lago Vista*, 532 U.S. 318, 347 (2001). Holding that travel-plan questions ordinarily fall within the scope of a traffic stop gives officers the flexibility they need to investigate traffic violations and ensure their own safety without worrying that judges will dissect their routine travel-plan questions months or years after the stop. *Id.*

The majority acknowledges that travel-plan questions often fall within the scope of a traffic stop, but it holds that the questions here went too far. The majority's holding on this point conflicts with our recent decision in *Lewis*. *Lewis* is essentially identical to this case. Like Cole, Lewis was pulled over for following too closely. *Lewis*, 920 F.3d at 486. Like Cole, Lewis complained that the officer spent several minutes "asking about irrelevant travel matters." *Id.* at 492. Like Trooper Chapman, the officer in *Lewis* began by asking where the defendant was headed. We dismissed the idea that this question was unrelated to the traffic stop: "Officers across the country would be surprised if we countenanced the characterization of this basic, routine question as irrelevant to a

traffic stop." *Id.* Because Lewis's response to the officer's first question was "not entirely forthcoming," the officer—like Trooper Chapman—asked several follow-up questions. Lewis answered these follow-up questions in a similarly evasive manner. We squarely rejected Lewis's argument that the officer's travel-plan questions were impermissible: "The Constitution allows an officer to ask these questions during a traffic stop, especially when the answers objectively seem suspicious." *Id.* So too here: The Constitution allowed Trooper Chapman to ask Cole about his travel plans, especially because Cole's "answers objectively seem[ed] suspicious." *Id.*

The majority finds *Lewis* distinguishable on the ground that the officer there was efficiently pursuing the warning while simultaneously asking travel-plan questions. I doubt the constitutional boundary hinges on whether an officer is asking basic travel-plan questions simultaneously, rather than immediately before or after, processing the warning. Even assuming, however, that Trooper Chapman's travel-plan questions were outside the scope of the traffic stop—which they were not—the majority's distinction rests on a factual finding that the court below never made, i.e., that Trooper Chapman was not otherwise furthering the traffic stop while asking travel-plan questions. We simply do not know if that is true; the record is not developed on that point. In the district court, the parties' evidence and arguments centered on whether Trooper Chapman had probable cause to pull Cole over for a traffic offense and whether Trooper Chapman had reasonable suspicion to prolong the stop. The district court analyzed the evidence and legal issues accordingly. On appeal, Cole shifts his focus to the lawfulness of Trooper Chapman's travel-plan questions. The government does not assert waiver, but that does not give us license to roam through the

record and make factual findings that the district court never made and on which the parties never focused. Our job is to review the district court's factual findings for clear error—not to make factual findings in the first instance. *See United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020).

Further, the majority's factual finding appears to be incorrect. The limited evidence in the record suggests that Trooper Chapman was double tasking while talking to Cole. Trooper Chapman testified that he ran Cole's criminal history after receiving his driver's license, and that he got the results back while talking to Cole on the side of the road.  At the very beginning of the traffic stop, Trooper Chapman called in Cole's license plate, presumably so that dispatch could run a check on it. In the video of the stop, it sounds as though Trooper Chapman is working on something else while talking to Cole. There are long pauses in the conversation and various beeping noises. I understand the majority's unwillingness to infer from the beeping that Trooper Chapman was efficiently pursuing the traffic stop while talking to Cole—but there is no basis for drawing the opposite inference. By all appearances, Trooper Chapman was doing other things while talking to Cole on the side of the road. The majority's contrary finding goes beyond what the district court found and contradicts the record. As such, it is an improper basis for distinguishing *Lewis*.

More generally, the lack of factual findings on this point prevents us from drawing any conclusions on appeal about whether Trooper Chapman's travel-plan questions "prolonged the stop by several minutes," as the majority concludes. To begin, the travel-plan questions fell within the mission of the stop, so they could not have prolonged the stop.

And even if they did not, we lack the factual findings to determine whether Trooper Chapman "detour[ed]" from the stop to ask them. *Rodriguez*, 575 U.S. at 356. Contrary to the majority's suggestions, Trooper Chapman did not "admit[]" that he delayed the stop to ask travel-plan questions. To be sure, he testified that he was "trying to piece together Mr. Cole's story" before he asked for Cole's insurance information. But this does not mean he was not performing tasks related to issuing a warning while asking these questions. And the district court certainly never made such a factual finding, given that the parties did not raise this issue below. There is thus no basis for the majority's factual conclusion that Trooper Chapman admitted to delaying the stop.

The majority portrays its holding as in line with *Lewis* and the holdings of other circuits. But it does not cite any other circuit court decision holding a traffic stop unlawful because an officer asked travel-plan questions. And, for reasons I have explained, the majority provides no sound basis for distinguishing *Lewis*.[5]

Applying *Rodriguez* and *Lewis*, I would hold that the stop here was constitutional and affirm the judgment below. I respectfully dissent from the majority's decision to the contrary.

---

[5] Because the majority's holding conflicts with *Lewis*, I would circulate this opinion to the full court under Circuit Rule 40(e).